**Stephen Todd BOOKER, Petitioner,**

v.

**Louie L. WAINWRIGHT, Secretary, Department of Offender Rehabilitation, State of Florida, Respondent.**

No. 82–5468.

United States Court of Appeals, Eleventh Circuit.

April 25, 1983.

Rehearing and Rehearing En Banc Denied June 6, 1983.

Stephen Bernstein, Gainesville, Fla., for petitioner.

Raymond Marky, Larry Kaden, Asst. Attys. Gen., Tallahassee, Fla., for respondent.

Before FAY and VANCE, Circuit Judges, and ALLGOOD *, District Judge.

FAY, Circuit Judge:

Stephen Todd Booker appeals the district court's denial of his petition for habeas corpus challenging his sentence of death imposed pursuant to Florida Statute Section 921.141 (1977). On appeal, Booker advances four contentions: 1) the prosecutor's use of information derived from a psychiatric examination in cross examination of Booker during the penalty phase violated his fifth amendment rights; 2) the prosecutor's introduction of evidence concerning Booker's prior acts of violence permitted the jury to consider a nonstatutory aggravating circumstance; 3) the state trial court improperly limited the jury's consideration of nonstatutory mitigating factors; and 4) the Florida Supreme Court's solicitation of ex parte psychological material concerning

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

Booker was unconstitutional. After a careful consideration of Booker's claims on appeal, we affirm the denial of the petition for habeas corpus.

## I. FACTUAL BACKGROUND

Booker was convicted on June 19, 1978 in the state court of first degree murder, sexual battery and burglary based upon evidence which showed that Booker entered the Gainesville, Florida apartment of Lorine DeMoss Harman, a ninety-four year old woman, raped Harman and stabbed her repeatedly in the chest and neck causing her death. Booker was connected to the crime by body hair samples, fingerprints, and testimony concerning the print pattern of his shoes. Further, Booker "confessed" to a Gainesville police detective. This "confession" occurred while Booker was describing himself in the third person as Steve and calling himself "Aniel," which he spelled out for the detective and described as a demon.[1] While Booker was "Aniel," the detective asked him if "Stephen had done it," and Booker replied, "He did it, God damn it, he did it." There is no contention that the confession was involuntary and in fact, its substance was adduced during cross examination of the detective by Booker's attorney.

After Booker was duly indicted by the grand jury and a public defender appointed to represent him, defense counsel filed a motion for mental examination and notice of defense of insanity. (State Record at 4). A county judge granted the motion, committing Booker to an intake facility of the Department of Health and Rehabilitative Services to determine whether he was competent to participate in his own defense and appointing Jose Lineas, M.D. and George Barnard, M.D. to examine Booker as to his sanity or insanity at the time of the offense. (State Record at 9). Thereafter, both the state and defendant filed separate motions to appoint an additional psychiatrist to examine Booker on the grounds that the previously appointed doctors were unable to reach a conclusion regarding Booker's sanity at the time of the offense. (State Record at 32, 36). The state court appointed Dr. Frank Carrera to examine Booker. (State Record at 45). Dr. Carrera testified during the defendant's case and Dr. Barnard testified during the state's rebuttal case.

The case was submitted to the jury after three days of trial proceedings. The jury deliberated for slightly in excess of three hours and returned verdicts of guilty on all three counts. The next day, the advisory sentencing proceedings occurred.[2] The only evidence introduced by the state at this time was a document relating to Booker's prior conviction for robbery. The only evidence[3] introduced by the defense was the testimony of Booker. Booker also made a statement prior to counsel's arguments on

---

1. The detective explained Booker during this time as follows:

   Prior to the time that he became Aniel he would chant. And the chanting would go on for perhaps ten seconds, 15 seconds, not long. It was during this time that the glassy eyes appeared. He had the glassy eye appearance. He would then settle, be serene, smile, and in my terminology clench his teeth. The grinding would stop, but his teeth would clench, and in that form he would begin to whisper things that I had to lean forward to hear.

   As my questioning related toward Aniel and who Aniel was, how he became acquainted with Aniel, and so on, as my questions grew more direct, he would burst into tears and cry. And he would laugh and wipe his tears from his eyes in a split second. He would then settle back in the chair, face me

again, and be in a word, calm. He was rational in all aspects. Nothing was not understandable with the exception of the chant. (Transcript of Trial Proceedings, Vol. IV., p. 627).

2. Pursuant to Fla.Stat. Section 921.141 (1977), the court was required, upon the defendant's conviction of a capital felony, to conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment. After hearing all the evidence, the jury deliberates and renders an advisory sentence to the court of either death or life imprisonment.

3. The jury, however, is not restricted to evidence presented during the penalty phase in arriving at its advisory sentence and may consider evidence presented throughout the trial.

sentencing.[4] After hearing counsel's arguments and receiving the trial judge's instructions, a majority[5] of the jurors recommended the death sentence.

In October 1978, the trial judge had before him a presentence investigation report, the psychological report of Dr. Elizabeth MacMahon, certain medical records, a letter from Booker and the sentencing memoranda of counsel, as well as the recommendation of the jury and the oral arguments of counsel. The trial judge considered the statutory aggravating and possible mitigating factors and sentenced Booker to death for the murder of Lorine DeMoss Harman,[6] entering his written order in accordance with Fla.Stat. Section 921.141(3) (1977). (State Record at 142). *See also, Booker v. State,* 397 So.2d 910, 915–918 (Fla.1981).

Booker appealed to the Florida Supreme Court which affirmed the conviction and sentence. *Booker v. State,* 397 So.2d 910 (Fla.), *cert. denied,* 454 U.S. 957, 102 S.Ct. 493, 70 L.Ed.2d 261 (1981). Booker also joined 122 other death row inmates in petitioning the Florida Supreme Court for extraordinary relief based on that court's possible consideration of extra-record psychological material in affirming the sentences. The Florida Supreme Court denied relief, *Brown v. Wainwright,* 392 So.2d 1327 (Fla. 1981), and the United States Supreme Court denied certiorari, *Brown v. Wainwright,* 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981).

On March 22, 1982, the Governor of Florida signed a death warrant authorizing Booker's execution by electrocution on April 21. On April 13, Booker filed a petition for writ of habeas corpus in the district court for the Northern District of Florida, alleging various grounds for relief and including a prayer for stay of execution. The district court denied the stay orally on April 15 and by a summary order on April 19. (Record at 260). The district court filed its order denying petition for writ of habeas corpus on April 20. (Record at 261). Booker filed a notice of appeal and an application for certificate of probable cause and to proceed on appeal in forma pauperis (Record at 270–71). The district court issued a certificate of probable cause and a certificate to permit appeal in forma pauperis (Record at 260), as well as an order denying Booker's application for certificate of probable cause and to proceed on appeal in forma pauperis (Record at 273). In any event, appeal was taken to the Eleventh Circuit, which issued an order granting stay. *Booker v. Wainwright,* 675 F.2d 1150 (11th Cir.1982).[7] We now consider the merits of Booker's claims on appeal.

## II. USE IN CROSS EXAMINATION OF PSYCHIATRIC EXAM INFORMATION

### A. The Procedural Bar

On this appeal, Booker claims that his privilege against self incrimination was violated when the prosecutor utilized information during cross examination of Booker's

---

**4.** Booker, against the advice of his attorney, made the following statement to the jury:

> You people in the jury box have convicted me of first degree murder, sexual battery, and burglary. And you are going in the room and deliberate over what punishment should be given for a crime of this nature. A defendant found guilty of such a crime should receive the death penalty. That's it.

(Transcript of Trial Proceedings, Vol. V., p. 850).

**5.** Unlike the verdict, the advisory sentence of the jury need not be unanimous. Fla.Stat. Section 921.141(3) (1977). The jury considering Booker's sentence voted nine to three to impose the death sentence. (Transcript of Trial Proceedings, Vol. V., p. 886).

**6.** The trial judge also sentenced Booker to a fifty-five year term for sexual battery and to a thirty year term for burglary, both sentences to run consecutively.

**7.** The Eleventh Circuit panel noted:

> In the limited time available to this court to examine the procedure, it is unclear whether or not the district judge granted or denied petitioner's application for certificate of probable cause to appeal, there being in the papers furnished to us what appears to be an order granting same and another order of denial, both dated April 19, 1982. Petitioner alleges that the certificate of probable cause was denied.

675 F.2d at 1151.

penalty phase testimony which was derived from a psychiatric examination. Booker contends that since the constitutional protections mandated by *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), were not afforded Booker, his death sentence must be vacated.

The state, however, argues that we are barred from considering the merits of Booker's *Estelle v. Smith* claim in a habeas proceeding pursuant to 28 U.S.C. Section 2254 by the doctrine of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In *Sykes,* the United States Supreme Court held that a habeas corpus petitioner must show "cause and prejudice" in order to advance in federal court those claims barred from consideration in the state courts by a valid procedural rule. The United States Supreme Court recently reaffirmed the *Sykes* doctrine in *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), recognizing that the costs of the federal writ of habeas corpus "are particularly high when a trial default has barred a prisoner from obtaining adjudication of his constitutional claim in the state courts." 456 U.S. at 128, 102 S.Ct. at 1572.

The state argues that Booker's counsel did not adequately object at trial. During oral argument on this appeal, Booker's counsel, who has represented Booker throughout the state and federal proceedings, argued that the objection at trial was sufficient. Both parties also devoted considerable attention in their respective briefs to the "cause and prejudice" exception to *Sykes.*

■ One rationale for the *Sykes* doctrine is the integrity of the state court trial. "The failure of the federal habeas courts generally to require compliance with a contemporaneous-objection rule tends to detract from the perception of the trial of a criminal case in state court as a decisive and portentous event." *Sykes,* 433 U.S. at 90, 97 S.Ct. at 2508. However, equally important underpinnings of the *Sykes* doctrine

are considerations of comity and federalism. As recently stated in *Isaac,* without *Sykes'* requirement that defense counsel present constitutional claims during trial, the state appellate courts would not have a "chance to mend their own fences and avoid federal intrusion." *Isaac,* 456 U.S. at 129, 102 S.Ct. at 1572.

Considerations of comity and federalism have resulted in the development of a well settled exception to the procedural default rule of *Sykes:* where a state appellate court does not rely on a procedural default, but reaches the merits of the federal law claim, the *Sykes* bar is inapplicable. As explained by the United States Supreme Court, when the state courts do not indicate that a "federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the State by entertaining the claim." *County Court of Ulster County v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979). The former Fifth Circuit recognized this exception and applied it in numerous cases.[8] *See e.g., Sassoon v. Stynchombe,* 654 F.2d 371, 374 (5th Cir.1981); *Moran v. Estelle,* 607 F.2d 1140, 1142 (5th Cir.1979); *Cannon v. State of Alabama,* 558 F.2d 1211, 1216 n. 12 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978).

■ The state contends that Booker did not adequately object at trial or present his federal constitutional claim on appeal to the Florida Supreme Court. The state further contends that no exception is applicable because "it is clear from the Florida Supreme Court's opinion that this issue was treated as a question of state evidentiary law rather than a federal constitutional question." (Brief of Appellee at 20, n. 3). We do not agree.

The Florida Supreme Court described Booker's position on appeal thusly:

The defendant contends that during the sentencing proceedings the court committed error in permitting the prose-

---

8. We are bound by the precedent of the former Fifth Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

cutor to ask questions based on information gathered from court ordered psychiatric reports. The defendant argues that this violated his right against self-incrimination.

397 So.2d at 913. The Florida Supreme Court also noted that:

> The defendant recognizes that a court ordered psychiatric examination generally is not considered violative of defendant's right to freedom from compelled self-incrimination [9] and that psychiatrists may render opinions concerning sanity based on factual statements made by the defendant.

*Id.* In both the above references to the right against self incrimination, the right is referred to generally, without denominating whether it is specifically the right embodied in the Fifth Amendment to the United States Constitution or Florida Constitution, Article 1, Section 9. Booker's Initial Brief to the Florida Supreme Court mentions both sources *initially* and then refers to the right generally. In deciding the dispositive issue, the Florida Supreme Court concluded:

> A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him. *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

397 So.2d at 914. By relying on *Harrison,* which did not concern Florida's privilege against self-incrimination,[10] the Florida Supreme Court was apparently considering both the state and federal constitutional privileges against self-incrimination. We therefore conclude that where a state court does not make explicit whether it is considering the federal constitutional provision

or its state constitutional counterpart, and cites cases construing both, we will view the state court as having treated the issue as arising under both federal and state law for *Sykes* purposes. To hold otherwise would be to sanction an imprecision in jurisprudence intolerable in the realm of constitutional issues and to foreclose federal habeas review of federal claims because the language used by the state courts was vague.

Having decided that we are not barred by the procedural default doctrine of *Sykes,* we proceed to consider Booker's claim concerning the use of the psychiatric exam on the merits.

**B. The Substantive Claim**

Booker asserts that under *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), his constitutional privilege against self-incrimination was violated by the prosecutor's use of information allegedly gained from a psychiatric examination of Booker. In *Smith,* the United States Supreme Court held that

> when faced while in custody with a court-ordered psychiatric inquiry, respondent's statements to [the doctor] were not 'given freely and voluntarily without any compelling influences' and, as such, could be used as the state did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them.

*Id.* at 469, 101 S.Ct. at 1876. There is no contention that Booker was given *Miranda* or other suitable warnings before making statements to the psychiatrists who examined him.

Neither Booker's mere submission to a psychiatric or psychological examination, nor the fact that the defense may have requested an examination forecloses his claim under *Smith. Battie v. Estelle,* 655 F.2d 692, 702 (5th Cir.1981). In *Battie,* however, the former Fifth Circuit distin-

---

**9.** This was the state of the law prior to *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

**10.** Harrison was convicted of murder in the District of Columbia and the Court was construing the Fifth Amendment to the United States Constitution.

guished a situation where the government used the results of a court-appointed psychiatric examination only after the defense had introduced psychiatric testimony in order to raise a mental defect defense, *citing, United States v. Cohen,* 530 F.2d 43 (5th Cir.) *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976).[11] *Battie* approved *Cohen's* holding that "the introduction by the defense of psychiatric testimony constituted a waiver of the defendant's fifth amendment privilege in the same manner as would the defendant's election to testify at trial." *Battie,* 655 F.2d at 702.

■ In Booker's case, the issue of insanity was raised as a defense and a psychiatrist testified on behalf of the defendant. Thus, under *Battie,* there was a waiver of defendant's fifth amendment privilege as to psychiatric testimony. However, the jury had already rejected Booker's defense of insanity by finding him guilty on all three counts of the indictment and the use of the psychiatric testimony occurred during the subsequent penalty phase of the trial. We need not decide whether such a waiver under *Battie* during trial survives in the separate penalty proceeding in a capital case, since there is another determinative factor in Booker's situation.

Booker took the stand to testify during the advisory sentencing proceedings of the state trial. In answer to his attorney's specific inquiry as to whether he had a recollection of the day of the crime, Booker said he did not remember. Booker also testified that he had been in various hospitals, including Camp Codie Medical Center on Okinawa and Walter Reed Medical Center in Washington, D.C. while he was in the armed services. The following colloquy then occurred between Booker and his attorney:

Q: Have you had any difficulties during this time you were hospitalized from the time you were 13 until now with periods of time which you can't remember?

A: Yes, sir. Three of these occasions of hospitalization, that was the reason for being in the hospital.

Q: That you couldn't remember what had happened to you?

A: Yes, sir.

(State Transcript at 838). On cross examination, the prosecutor questioned Booker about his military service:

Q: Do [sic] you have problems with acts of violence while you were in the service?

A: Yes. I did.

Q: Other than these for fighting, have you ever attempted to kill people?

Q: While you were in Okinawa in the houses?

A: Could be.

Q: Do you know what I am talking about, Mr. Booker?

A: Yes.

Q: I'm talking about houses of prostitution. Did you ever try to kill anybody over there?

A: Not necessarily. I used to—we used to rob cat houses.

Q: What weapons did you use to hit people with?

A: Claw hammer.

Q: How many people do you think you hit with the claw hammer?

A: I can't recollect.

Q: More than five?

A: I would say about five.

Q: More than ten?

A: No.

(State Transcript at 841–42). Later, Booker's attorney objected to the prosecutor's questions relating to the day of the crime.

---

**11.** Writing five years prior to *Estelle v. Smith,* the Fifth Circuit in *Cohen* stated

[w]e have never reached the issue of whether a defendant's privilege against self-incrimination is violated per se by a court ordered psychiatric examination solely to determine the accused's mental condition at the time of the commission of the offense. Several other circuits have rejected this unconstitutionali-

ty-per-se argument on various grounds, while one has indicated approval of it. Relying on a balancing test, we choose to follow the former line of cases and permit compelled psychiatric examinations when a defendant has raised the insanity defense. [footnotes omitted].

530 F.2d at 47.

The trial court overruled the objection on the grounds that the question of lapse of memory on the day of the incident was opened by the defendant on direct. The cross examination continued:

Q: Mr. Booker, my question to you was do you remember when you got up at 7:00 or 7:30 feeling that morning like you wanted to kill somebody?

A: Part of the way, yes.

Q: Did you know Mrs. Harman prior to this date?

A: No. I didn't.

Q: Had she ever done anything to you in her life to deny you anything or prevent you from anything?

A: No. In regards to me knowing her, I still don't know her. I have just been confronted with her in this courtroom in this charge.

Q: Did you attempt to kill anybody else that day; do you remember that?

A: Sure, I remember.

Q: Do you remember you did?

A: No. I didn't try to kill anybody that day.

Q: In the morning?

A: Right.

Q: You did not?

A: No. I didn't.

Q: Did you think about doing it?

A: Sometime I did, but I gave up the idea because it was crazy.

(State Transcript at 844-45)

Booker contends, and we assume without deciding, that the prosecutor obtained the information about the Okinawa houses of prostitution and Booker's state of mind upon waking on the day of the crime through information given to a psychiatrist[12] without the constitutional safe-guards of *Estelle v. Smith.*[13] Yet even assuming Booker's statements would not have been admissible in the state's case, there is no constitutional prohibition against using the information for impeachment purposes. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).[14] In *Harris,* the United States Supreme Court reasoned:

Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. [citations omitted]. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could be laid before the jury by way of cross examination and impeachment.

The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of defense, free from the risk of confrontation with prior inconsistent utterances.

401 U.S. at 225-6, 91 S.Ct. at 645-646. Since "the holding in *Smith* followed logically from the *Miranda* decision itself," *Battie* 655 F.2d at 699, it is likewise logical to conclude that the shield provided by *Smith* is also not susceptible to being perverted into a license to use perjury free from permissible impeachment.

While the prosecutor's questions concerning events on Okinawa may have been susceptible to an objection as being outside the scope of direct examination,[15] the cross ex-

12. The Florida Supreme Court found that "the record does not conclusively show that the state attorney secured this information from the psychiatric reports." 397 So.2d at 914.

13. We have previously decided that *Smith* should be given retroactive effect. *Battie v. Estelle,* 655 F.2d at 699.

14. *See also, Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), (use of prearrest silence to impeach defendant does not violate privilege against self incrimination); *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), (evidence suppressed as fruit of unlawful search and seizure may be used to impeach defendant's testimony given on cross examination).

15. The Florida Supreme Court, however, held that:

The defendant opened up the question of what he remembered and whether he did or

amination questions do not rise to the level of a constitutional violation [16] and relief in a federal habeas action is therefore not warranted.

## III.  PRIOR ACTS OF VIOLENCE

█ Booker contends that the Okinawa activities elicited on cross examination of Booker during the advisory sentencing proceeding requires granting of the writ on another basis.  In *Henry v. Wainwright*, 661 F.2d 56 (5th Cir.1981),[17] we held that it is constitutional error to allow a jury in a capital case to consider nonstatutory aggravating factors in deciding whether the death penalty should be imposed.  Booker seeks to extend *Henry* to situations where the jury is properly instructed to consider only statutory aggravating factors but evidence of a nonstatutory aggravating factor has been presented to the jury.

To adopt Booker's theory would be to presume that the jury did not follow the court's instructions listing the aggravating circumstances and specifically limiting the jury's consideration to those circumstances.  There is no hint in the record that the jury would have construed the Okinawa impeachment testimony as a nonstatutory aggravating factor.  We decline to posit a per se rule to the effect that the introduction of any evidence that might *possibly* be interpreted as a nonstatutory aggravating circumstance renders the imposition of the death penalty unconstitutional notwithstanding specific instructions limiting the

jury's consideration to the enumerated statutory aggravating factors.

## IV.  JURY INSTRUCTIONS ON NON-STATUTORY MITIGATING FACTORS

█ Booker argues that the trial court's instructions to the jury during the advisory sentencing proceedings improperly limited the jury's consideration of nonstatutory mitigating factors.  The state argues that our consideration of this issue is barred by the procedural default doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).  Booker concedes procedural default as to the jury instructions, but contends that he comes within the cause and prejudice exception to *Sykes*.

This issue is controlled by *Ford v. Strickland*, 696 F.2d 804 (11th Cir.1983) (en banc).  In *Ford*, the trial judge similarly instructed the jury to consider *only* the enumerated aggravating factors and, omitting the "only," to consider the following mitigating factors.  *Ford* also conceded procedural default in *Sykes*.  In *Ford*, we stated:

> The *Sykes* issue becomes blurred in this case, however, because of two principles which mesh to deny Ford relief on this point.  First, the Supreme Court has held that an erroneous jury instruction satisfies *Sykes'* prejudice prong only if actual, not possible, prejudice is shown so that there is '*actual* and substantial disadvan-

---

did not remember certain things.  The trial court was correct in ruling that the state attorney had a right to inquire as to what defendant remembered, as this was an issue presented by the defendant during the sentence proceedings.
397 So.2d at 914.

**16.**  *Cf., Harris v. Spears*, 606 F.2d 639 (5th Cir. 1979), where we affirmed the granting of the writ of habeas corpus on the basis of the prosecutor's cross examination questions to defendant concerning statements attributed by implication to defendant's son.  We stated "The constitutional error occurred, however, not when the questions were asked, but when the son was not called."  *Id.* at 643.  In *Harris*, the sixth amendment right to confrontation was determinative, a factor not applicable in *Book-*

er, since what is involved is Booker's statements.

**17.**  This Unit B case decided November 12, 1981, is binding precedent for the Eleventh Circuit.  *See, Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982).  *Henry* was vacated and remanded to the Eleventh Circuit by the United States Supreme Court, 457 U.S. 1114, 102 S.Ct. 2922, 73 L.Ed.2d 1326, for further consideration in light of *Engle v. Isaac*.  On remand, we found that the issue was properly before us and adhered "to our earlier judgment that the state trial court committed constitutional error by allowing the non-statutory aggravating circumstances to be placed before and considered by the jury at Henry's sentencing hearing."  *Henry v. Wainwright*, 686 F.2d 311, 315 (5th Cir.1982) (Unit B).

tage, infecting his entire trial with error of constitutional dimensions.' *United States v. Frady,* 456 U.S. 152, 168, 102 S.Ct. 1584, 1595, 71 L.Ed.2d 816, 832 (1982).

Second, in evaluating a trial court's instructions, we must determine the interpretation a reasonable juror might give the words of the instruction in question. *Sandstrom v. Montana,* 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979). The entire charge must be examined as a whole to discern whether the issues and law presented to the jury were adequate. *Davis v. McAllister,* 631 F.2d 1256, 1260 (5th Cir.1980), *cert. denied,* 452 U.S. 907, 101 S.Ct. 3035, 69 L.Ed.2d 409 (1981).

The fundamental issue then is whether Ford has carried his burden in establishing that his jury perceived that in deciding whether to recommend life or death, it was denied the use of any nonstatutory mitigating factors.

696 F.2d at 812. As in *Ford,* we conclude that Booker has not carried his burden in establishing the jury perceived that in deciding to recommend life or death, it was denied the use of any nonstatutory mitigating factors. *Ford* set forth four reasons for this conclusion. Three of those reasons are applicable to Booker's case and bear repeating:

[F]irst, the trial court read the statute as written, setting forth the entire list of statutory mitigating circumstances, which statute omits the word 'only.' The Supreme Court has recognized the Florida statute does not limit a jury's consideration of mitigating circumstances to those listed in the statute. *Proffitt v. Florida,* 428 U.S. [242] at 250 n. 8, 96 S.Ct. [2960] at 2965 n. 8 [49 L.Ed.2d 913].

*Second,* the instruction here was different from *Washington v. Watkins,* 655 F.2d 1346 (5th Cir.1981), *cert. denied,*456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982), where the state trial judge concluded the charge with these words:

If you unanimously find from the testimony that *one or more of the preceding*

*elements of mitigation* exist[s], then you must consider whether *it* outweighs the aggravating circumstances you previously found and you must return one of the following verdicts....

*Id.* at 1368 (emphasis added). Here the jury was not confined to two 'preceding elements of mitigation,' as in *Washington.*

*Third,* that petitioner was not limited in the introduction of evidence which might be considered mitigating and that the jury arguments encompassed all evidence introduced in the case explains counsel's perception that the jury was not denied the use of any evidence in weighing sentences. Thus had petitioner known of *Lockett [v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973], he would still have no reason to object because the jury was not in fact being limited to what it could consider.

*Id.* at 812–13. As in *Ford,* the rational conclusion is that the jury did not perceive a restriction on the consideration of any mitigating circumstances.

## V. NONRECORD MATERIAL BEFORE THE FLORIDA SUPREME COURT

▉ The final issue raised by Booker concerning the Florida Supreme Court's consideration of nonrecord material is also controlled by *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983) (en banc), where we stated:

But even if members of the [Florida Supreme] court solicited the material with the thought it should, would or might be used in the review of capital sentences, the decision of the Florida court that it should not be so used, the statement that it should not be so used, and the rejection of the notion that it affected the judgment of the reviewing judges of the court ends the matter when addressed at the constitutional level.

*Id.* at 811. We note only that Booker's attorney was furnished with the Florida Supreme Court's request of Booker's presentence investigation report, thus rendering this factual situation even weaker than *Ford.*

## VI. CONCLUSION

Based on the foregoing, the district court's denial of the petition for writ of habeas corpus is AFFIRMED.