Ray SANDSTROM, Petitioner-Appellee,

v.

Robert BUTTERWORTH, Sheriff, et al., Respondents-Appellants.

No. 83–5431.

United States Court of Appeals, Eleventh Circuit.

Aug. 13, 1984.

James P. McLane, Asst. Atty. Gen., State of Florida, West Palm Beach, Fla., for respondents-appellants.

Ray Sandstrom, pro se, Sandstrom & Haddad, Fort Lauderdale, Fla., for petitioner-appellee.

Before TJOFLAT and CLARK, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

GOLDBERG, Senior Circuit Judge:

The functioning of our legal system occasionally brings into direct opposition fundamental values upon which the entire system rests. Absolute conflicts between these basic values, where preserving one value requires compromise of another, are among the most perplexing challenges that this Court encounters. This habeas corpus appeal presents just such a challenge. It involves one manifestation of the tension that exists between the courts' criminal contempt power and various tenents of constitutional due process. In the case at bar, petitioner's conviction for criminal contempt stands in conflict with an important principle of due process—the right to an impartial tribunal. To uphold the state court's adjudication of contempt would necessarily and significantly intrude upon that fundamental due process value. Alternatively, to vindicate the petitioner's right to an impartial tribunal would require imposing some limitation upon courts' traditionally broad contempt authority. Under the circumstances here, however, the potential impairment of the court's power is outweighed by unfairness to the petitioner. We, therefore, resolve the instant conflict of values in favor of due process.

## BACKGROUND

Petitioner, an attorney, was adjudged in direct criminal contempt by a Florida state trial judge in the course of a murder trial. Petitioner was representing James Nolan, who was being tried on three counts of first degree murder. The trial was Mr.

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

Nolan's second on the murder charges.[1] It opened on a note of hostility, with the following exchange occurring between the presiding judge, the petitioner, and Mr. Haddad, petitioner's law partner:

THE COURT [to Mr. Haddad]: You are not co-counsel in this case. I am telling you right now you are not going to interrogate any witnesses in this case. You pull smart stuff on me, I will put it back on you.

MR. HADDAD: I told the Court Monday when I was here to start picking a jury, I was not going to be involved in the jury selection, I had to be out of town on another case.

THE COURT: And on Wednesday when Mr. Sandstrom wasn't here I called your office and they said that they couldn't find you anywhere around the office all day long, that you couldn't come over to pick a jury because they didn't know where you were, and I am telling you right now you are not going to be in this court.

MR. HADDAD: The Court is precluding me?

THE COURT: Yes.

MR. HADDAD: When I tried this case the last time, the Court is precluding me?

THE COURT: Don't get smart. I am sick of you; okay? You are not involved in this case. Just get out. Get out of this courtroom. I don't even want you around.

MR. SANDSTROM: Let the record show an objection on behalf of the defendant to the directions of the Court in precluding the defendant from having full representation in the manner which he had at the last trial which he has contracted for on this occasion, and contrary to the wishes of the defendant.

THE COURT: The defendant isn't here. I presume he will substantiate what you are saying. I am telling you I am not having that little creep come in to this courtroom and get involved in it. I don't like him. I don't like what he is doing. I don't like your being involved in this case. You are too smart-alecky. Your attitude is bad, and I don't want you in this courtroom. You told me before you weren't representing this defendant, Mr. Sandstrom was going to pick the jury, you are not available, and when Mr. Sandstrom is missing and you are not going to be in this case now, and I don't want anything off you because I am going to put you in jail. I'm sick of you.

Record, Vol. I at 90–91.

Conflict between the judge and the petitioner arose early in the trial, concerning the judge's conduct towards petitioner's partner and petitioner's arrival time in court.

THE COURT [to petitioner]: I told Mr. Haddad he couldn't come into this courtroom. I will change my mind to the extent he can sit at the bench with you. He is not going to participate at the trial. He is not going to interrogate any witnesses. He is not going to argue any arguments.

Mr. Haddad did that, and he advised the Court Wednesday telling the Court he wasn't available to interrogate the jury and help pick the jury when you were off on a trip to New Orleans. You told the Court you would be back at 1:00. You got back at 3:30 on the nose because I was going to dismiss the jury at 3:30 on the nose, and Mr. Haddad's office was called by the clerk's office twice and my office twice, and the girls said they simply couldn't find Mr. Haddad, he wasn't around.

I believe that Mr. Haddad was not around. I think he is a liar. I think he is a poor attorney. He is not a good officer of this court. He doesn't belong in this court, and I am not going to have him practice in this court in this trial.

---

1. The *Nolan* case was tried three times with petitioner as counsel. The first two trials resulted in mistrials—the first because of a hung jury and the second because of the occurrences that led to the contempt judgment at issue in this case. The third trial resulted in an acquittal of Mr. Nolan on all counts.

I don't care whether he is an attorney representing the defendant or not.

MR. SANDSTROM: The remarks of this Court are such that we are compelled to make a motion to disqualify the Court on the basis thereof. I have done it up in form, and about all the Court gets to consider is the form. I wanted to advise it would be up in a couple of minutes.

THE COURT: Bring me the form. I will sign an order, and we will continue on with this trial. I am going to see that Mr. Nolan gets a fair trial, and I am not going to have that included (sic) Haddad coming in here and acting like a clown.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT [to petitioner]: I made my ruling, and that is the way it is going to be. I want to get on with the trial. You were to be here at 12:30. You have a reason for not being here, and I accept it. I'm not going to tolerate it again. We are going to trial at the times I set, and if you don't show up at the times I am going to find you in contempt of court.

Record, Vol. I at 91–94.

The motion for mistrial was denied. Later in the trial, during petitioner's cross-examination of a prosecution witness, petitioner was held in contempt. Sentencing for this contempt, however, apparently never took place.

Q (By Mr. Sandstrom) On this one, does it not say—

A That is unknown white male number two. This one I have an autopsy—

Q This says unknown white male?

MR. KERN: He doesn't let him answer the question.

THE COURT: Let him finish.

A This one is identified—

Q (By Mr. Sandstrom) I didn't ask you that. I am—

THE COURT: You asked him to identify. Now please give him a chance to answer.

MR. SANDSTROM: I am asking him about this portion.

THE COURT: You are so rude and nasty about it.

MR. SANDSTROM: Wait a minute now. I am objecting and making a motion. I want to excuse this jury.

THE COURT: You are not moving the jury out. Make your motion.

MR. SANDSTROM: I move for a mistrial on the grounds that the Court is participating in this and employing the improper language in this courtroom reflecting on counsel for the defendant.

THE COURT: You are acting like an animal.

MR. SANDSTROM: No, I am not acting like any animal. I think the Court is doing that.

THE COURT: You are the rudest person I have ever seen.

MR. SANDSTROM: I can say the same for you.

THE COURT: It is because of you.

MR. SANDSTROM: It is because of you that I need act like I do.

THE COURT: Okay. Now we are going to stop this. The next time we go through it, I am going to find you in contempt.

MR. SANDSTROM: Go ahead. If you think you are threatening me, I understand the grounds of propriety and how to walk within them. When you invite a comment, I shall comment.

THE COURT: I find you in contempt of Court. I will sentence you after the trial is over.

MR. SANDSTROM: At this time I renew my motion because of the Court participating in that delusion in front of the jury.

THE COURT: Denied.

Record, Vol. I at 97–98.

A conflict over petitioner's method of cross-examination also led to the contempt citation at issue in this case.

MR. KERN: I would also point out that counsel is wrong, and I object to it, and I object repeatedly.

MR. SANDSTROM: I haven't misquoted, and I am entitled to misquote on any

occasion I choose, and if the witness accepts that version, it only tends to impeach him because people that know what they are talking about don't accept the version that is incorrect.

THE COURT: I am instructing you unless he tells you—

MR. KERN: I am never going to tell him it is correct.

THE COURT: Unless he tells you he is reading it correctly from the transcript—

MR. SANDSTROM: I am never. Then we are all through examining.

THE COURT: Do what you want.

MR. SANDSTROM: I want—I am going to do what I am right—

THE COURT: You are going to jail very shortly.

MR. SANDSTROM: You might cite me, but I am going to take it up because I am not going to jail because we will have a review of it.

THE COURT: Yes, we will.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: I am telling you what I want you to do, and you are going to do it.

MR. SANDSTROM: I don't care about being asked what you want me to do.

THE COURT: Mr. Bailiff, take that gentleman and put him in the jail now.

MR. SANDSTROM: No. I am entitled to be treated differently.

THE COURT: You are going to jail, sir.

MR. SANDSTROM: I am entitled to be treated differently.

THE COURT: Call in a couple more bailiffs and take this man and put him in the jail.

MR. SANDSTROM: I have my rights, and one of those rights is to have an appropriate citation and a right to appeal it to a court that is impartial, and not in the manner in which this Court has exhibited its prejudice towards me.

THE COURT: Just a minute. He is right. I will go get the rule, and we will ask the question properly, and then we will put him in jail.

MR. SANDSTROM: Is that right? Then I move to disqualify you on your prejudice which is quite obvious.

Record, Vol. I at 136–141.

A short recess was taken, and then with the jury out of the courtroom, petitioner was adjudged in contempt and sentenced to thirty days in jail.

THE COURT: Mr. Sandstrom, for ten years I have been practicing—I have been trying cases as a Criminal Court Judge, and for ten years you have had your nauseating effect upon this Court and every other court in this courthouse.

Your antics are designed to cause mistrials so that your clients don't go to trial. You have been doing that, and you did it the last time we went to trial a few months back, a couple months back, and you have done it again this time.

You are going to attack this Court until such time as the Court finally loses its patience and makes some statement which you are then going to take to the Appellate Court and have the Appellate Court hopefully reverse on.

Well, I am telling you I have had about enough of you, and enough of your tactics.

Now I am telling you that you will either do the way I tell you to do in your interrogation in regard to transcripts or you are going to jail this afternoon.

MR. SANDSTROM: I am not going to alter my defense to buckle to the Court in such a manner that this defendant does not have his proper cross examination that he is lawfully entitled to.

THE COURT: Okay, Mr. Sandstrom, this is the last time.

Are you going to do the interrogation in a manner I tell you to do and then take it before the Appellate Court if you don't like the way I tell you to do it and the results are against your client, or are you going to refuse to do it the way I tell you to do?

MR. SANDSTROM: The Court is preventing me from examining him.

THE COURT: I am asking you which way you want to go.

MR. SANDSTROM: I cannot examine in the posture you put it.

THE COURT: I will put Mr. Edson back on the stand.

MR. SANDSTROM: I cannot examine in the posture you have put it.

THE COURT: I find you in contempt of Court and sentence you to thirty days in jail.

Mr. Bailiff, take him to jail.

MR. SANDSTROM: I have the right to appeal.

THE COURT: You have a phone call in the jail to call your partner, Mr. Haddad. You are going to jail, Mr. Sandstrom.

MR. SANDSTROM: I have the right to supersedeas immediately as a matter of right.

THE COURT: And this Court will be recessed until you decide to change your mind or until you take the matter before the Appellate Court.

MR. SANDSTROM: I ain't going to do that with you.

THE COURT: Take the defendant to jail. I will issue an order this afternoon. This Court is recessed until such time that the defendant changes his mind.

(Thereupon, Mr. Sandstrom was removed from the courtroom.)

THE COURT: Let's go into session for the purpose of instructing the bailiff what to do.

Mr. Nolan will be taken back to his cell. The other prisoners will be taken into the custody of the U.S. Marshal. Mr. Sandstrom will go to jail, and he will remain there until an appeal is filed or a petition is filed by the Appellate Court, and this Court will stay in recess until such time as something happens, the Appellate Court orders me to go back to trial, declare a mistrial, release Mr. Sandstrom, or go on with the trial, whichever.

THE BAILIFF: This trial is in recess until further notice.

Record, Vol. I at 144-47.

The next day the judge declared a mistrial in the *Nolan* case. He also recused himself from further responsibilities in the matter, explaining that, "this Court feels that it can't give the defense—I should say the defendant—a fair trial." Record, Vol. I at 151. The judge's order denying petitioner's motion for supersedeas bond read as follows:

This Court found defendant guilty of criminal contempt of court and refuses the person Ray Sandstrom supersedeas bond notwithstanding he meets the criteria of *Younghams v. State,* he is costing this state anticipated thousands of dollars by interfering with the proceedings of this court and preventing the completion of the trial.

Record, Vol. II at 467. The State District Court of Appeal later released petitioner on his own recognizance. *Id.*

## PROCEEDINGS BELOW AND ISSUES ON APPEAL

Petitioner appealed the trial judge's adjudication of contempt to the State District Court of Appeal. That Court affirmed the judgment and sentence, *see Sandstrom v. State,* 402 So.2d 461 (Fla. 4th DCA 1981), and the Florida Supreme Court denied petitioner's application for certiorari. Petitioner then filed for a writ of habeas corpus in federal district court, arguing that he had been denied due process because the trial judge who cited him for contempt had become personally embroiled with him. Following an evidentiary hearing and the district court's review of the record, that court concluded that the "state judge was emotionally entangled with the petitioner." Record, Vol. II at 463. The district court held that a denial of due process had occurred and granted the petition for habeas corpus.

On appeal, the State raises three issues. First, it contends that petitioner failed to exhaust his state court remedies, requiring a dismissal of his petition. Second, the

State urges that the district court erred in not deferring to factual determinations made by the state appellate court. Finally, the State argues the merits of the district court's determination. According to the State, the state trial judge committed no constitutional error by failing to defer adjudication and sentencing of the contempt to another judge.

## EXHAUSTION

■ The State claims that petitioner failed to put his constitutional claim of due process violation before the state courts. Instead, he presented only the facts upon which the violation was based. We note that in many cases the exhaustion issue indeed turns upon what the petitioner argues in the state courts. In these cases it is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state law claim was made. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982). The habeas petitioner "must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." *Id.*

In this case, however, the core of the exhaustion issue lies not in how petitioner's state court pleadings are to be interpreted. Instead, we must look to what the state courts actually considered. The State District Court of Appeal heard petitioner to raise two issues—i.e., that petitioner's conduct could not support a finding of contempt and that the trial judge should have disqualified himself from ruling on the contempt citation. *Sandstrom v. State, supra*, 402 So.2d at 463. Citing *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), as a "leading exposition on the subject of the disqualification of

judges in contempt proceedings," [2] the state court read *Mayberry* to indicate that the trial judge in petitioner's case was not required to disqualify himself. 402 So.2d at 462–63. In *Mayberry*, the Supreme Court looked to the Due Process Clause of the Fourteenth Amendment in deciding whether the defendant was entitled to a criminal contempt trial before a judge other than the one who was the target of the contumacious acts. 400 U.S. at 467, 91 S.Ct. at 505. The state court's reliance on *Mayberry* makes it clear that the court was aware of a federal constitutional basis for petitioner's claim and that the court actually considered federal constitutional law in deciding that claim. Cf. *Booker v. Wainwright*, 703 F.2d 1251, 1256 (11th Cir.), cert. denied, —— U.S. ——, 104 S.Ct. 290, 78 L.Ed.2d 266 (1983) (reliance on United States Supreme Court case indicated that the state court considered federal constitutional issue as well as state law issue).

This focus on what the state courts actually considered is consistent with the goals underlying the exhaustion requirement. It fully "protects the state courts' role in the enforcement of federal law and prevent[s] disruption of state judicial proceedings." See *Thompson v. Wainwright*, 714 F.2d 1495, 1504 (11th Cir.1983). The Florida Court of Appeal not only had the "opportunity to pass" upon petitioner's claimed constitutional violation, see *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982), it actually did so. Exhaustion of the constitutional issue raised in this appeal, therefore, is undeniable. There is no better evidence of exhaustion than a state court's actual consideration of the relevant constitutional issue.

2. Under Florida law, all claims that a judge adjudicating contempt should disqualify himself or herself are now decided upon federal constitutional standards. Reviewing a trial court contempt citation in *Scott v. Anderson*, 405 So.2d 228, 233 (Fla. 1st DCA, 1981), the District Court of Appeal noted:

The familiar axiom "a man should not be judge of his own case" is of ancient origin, but it has apparently not yet found its way into

Florida law to the extent necessary to provide distinct guidelines for deciding under what circumstances a judge must disqualify himself to adjudicate direct criminal contempt charges involving disrespect or criticism directed to that judge. *Since the question is ultimately one of federal constitutional import, we must turn to and be guided by the federal decisions.*

(emphasis added).

## DEFERENCE TO STATE COURT FINDINGS OF FACT

The State contends that the federal district court erred in not deferring to factual determinations made by the District Court of Appeal. Factual determinations made by a state court are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(d),[3]; *Sumner v. Mata*, 455 U.S. 591, 592, 102 S.Ct. 1303, 1304, 71 L.Ed.2d 480 (1982). Our examination of the State Court of Appeals opinion, however, reveals no particular finding of fact contradicted by the federal district court. Specifically, the state court made no findings regarding any preexisting hostility on the part of the trial judge towards the petitioner or concerning the judge's attitude towards petitioner during the *Nolan* trial. Rather, after reciting the "directly and personally embroiled" standard articulated in *Mayberry, supra*, 400 U.S. at 464–66, 91 S.Ct. at 504–05, the State Court concluded, "[o]ur review of the transcript convinces us that the judge was not required to disqualify himself herein."

*Sandstrom v. State, supra*, 402 So.2d at 463–64. This conclusion, that the facts of the case did not state a constitutional violation, derives from a mixed question of law and fact. The statutory presumption of correctness in § 2254, therefore, does not apply. *Sumner v. Mata, supra*, 102 S.Ct. at 1307, n. 10; *see also Grizzell v. Wainwright*, 692 F.2d 722, 725 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983).

## AN IMPARTIAL TRIBUNAL

Having found the State's initial two arguments to be without merit, we now reach its contention that the district court erred in holding that petitioner's due process right to an impartial tribunal has been violated. Citing *Mayberry v. Pennsylvania, supra*, 400 U.S. at 464–465, 91 S.Ct. at 504–505 and *Farmer v. Strickland*, 652 F.2d 427, 436 (5th Cir.1981), *cert. denied*, 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982),[4] the State urges that we base our

---

**3.** 28 U.S.C. § 2254(d) provides:

(d) in any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record. And in an evidentiary hearing in the proceeding in the Federal court when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

**4.** *Mayberry* and *Farmer* are discussed *infra* at 738 F.2d at pp. 1211–1213.

ruling today on a notion of timing. The argument relies on the fact that the state trial judge in this case acted immediately after the contumacious act and during an ongoing trial. The State points out that such immediate action gives a judge the means to vindicate judicial authority and to maintain order. Under the State's approach, bias on the part of a trial judge could never require reversal of a contempt judgment if the contempt was adjudicated and sentence pronounced during an ongoing trial.

This argument is not a frivolous one. Maintenance of judicial authority and courtroom order are essential to the proper functioning of the justice system. However, the State's resolution of the tension between contempt authority and the right to an unbiased tribunal seriously erodes the latter principle. Payment of such a high price is not necessary to preserve the courts' contempt authority. Moreover, a single-minded focus on authority and order to the necessary exclusion of due process serves neither value well. The inadequacies inherent in the State's position become

apparent if the "contempt/biased tribunal" issue is viewed in a broader context—i.e., as one of the multiple conflicts that arise between due process and the contempt power.

In placing the instant conflict in this broader setting, we will first discuss the function of the criminal contempt power. We will then analyze how the Supreme Court has dealt with clashes between the contempt power and due process rights other than the right to an unbiased tribunal. With that background, we will look finally to how the Court has treated conflicts between the contempt power and the right to an unbiased tribunal and consider the specific arguments raised by the parties in this case.

### A. The Function of Summary Criminal Contempt

The judicial power to punish through summary criminal contempt adjudication is a firmly established element in the operation of this country's courts.[5] The power to summarily hold an individual in direct[6] criminal contempt operates to vindicate the

**5.** Whether summary contempt authority is an inherent and necessary development in our legal system or is merely a historical accident is a matter of controversy. Blackstone advanced the former theory, characterizing the power as derived from the "first principles of judicial establishments," and as "an inseparable attendant upon every superior tribunal." 4 Commentaries on the Laws of England 286. This position gained recognition from the Supreme Court in *Ex parte Terry*, 128 U.S. 289, 302–03, 9 S.Ct. 77, 78–79, 32 L.Ed. 405 (1888):

> [C]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum in their presence, and submission to their lawful mandates.
>
> The power to punish from contempts is inherent in all courts. Its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts; and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power.
>
> And such is the recognized doctrine in reference to the powers of the courts of the several states.

(citations omitted).

Some modern academics and jurists have cast doubt on the inherent character of the contempt power, questioning whether it is essential to maintain courtroom order and respect for judicial authority. Specifically, commentators have disputed the length of the summary contempt power's historical roots. *See* Note, *Taylor v. Hayes: A Case Study in the Use of the Summary Contempt Power Against the Trial Attorney*, 63 Ky.L.J. 945, 948 (1975); Comment, *Counsel and Contempt: A Suggestion that the Summary Power Be Eliminated*, 18 Duquesne L.Rev. 289 (1980). In his dissent in *Green v. United States*, 356 U.S. 165, 193–94, 78 S.Ct. 632, 648–49, 2 L.Ed.2d 672 (1958), Justice Black observed that, "this extraordinary authority slipped into the law as a very limited and insignificant thing." He referred to the power as "an anomaly in the law." *Id.*

**6.** A historical dichotomy, based on where the contemptuous act occurs, exists within courts' contempt authority. Where the contemptuous act occurs within a court's presence, punishment is by direct contempt. The more limited power of indirect contempt is used to punish acts outside the court's presence.

authority of the court and stands as a bulwark against disorder and disruption in the courtroom. Moreover, summary adjudication and sentencing of contempts occupies a unique niche in our criminal justice system. Only in this kind of proceeding do the otherwise inconsistent functions of prosecutor, jury and judge mesh into a single individual. That one actor proceeds on his own knowledge of the facts "without further proof, and without issue on trial in any form." *Ex parte Terry, supra*, 128 U.S. at 309, 9 S.Ct. at 81 (1888).[7]

The Supreme Court has advanced dual justifications for bypassing procedures mandated by the Bill of Rights. First, because in a direct contempt the judge has observed the contemptuous act, there is "no need of evidence or assistance of counsel before punishment." *Cooke v. United States*, 267 U.S. 517, 534, 45 S.Ct. 390, 394, 69 L.Ed. 767 (1925). Second, the maintenance of courtroom decorum sometimes necessitates quick and forceful action. *Id.*[8] More recent Supreme Court cases have placed less emphasis on the "efficiency", justification for summary adjudication. *See e.g., Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) (judge's observation of criminal act may obviate the need for a full-scale trial of a contemnor, but basic notice and hearing are still required); *Codispoti v. Pennsylvania*, 418 U.S. 506, 515–16, 94 S.Ct. 2687, 2692–93, 41 L.Ed.2d 912 (1974). However, resting mainly on the need to maintain courtroom order, summary contempt adjudication remains a viable judicial power where the "necessity of circumstances" warrants. *Codispoti v. Pennsylvania, supra*, 418 U.S. at 515, 94 S.Ct. at 2692.

## B. Conflicts of Values

■ Despite the Supreme Court's acknowledgment of summary contempt authority as a necessary component in our justice system, the Court nevertheless has placed significant limits on the historically broad power. The inescapable clash between summary adjudications of contempt and basic due process rights has been explicitly recognized by the Court. *See Offutt v. United States, supra*, 348 U.S. at 14, 75 S.Ct. at 13. Reciting a list of cases in which appellate courts had found abuse of the contempt power, Justice White, in *Bloom v. Illinois*, 391 U.S. 194, 207, 88 S.Ct. 1477, 1485, 20 L.Ed.2d 522 (1968), cautioned against "vesting the judiciary with completely untrammeled power to punish contempt." Indeed, it is well established that the contempt power carries with it a great potential for abuse; its exercise must be delicate and care should be taken to avoid arbitrary or oppressive results. *Id.* at 202, 88 S.Ct. at 1482. *See also Cooke v. United States, supra*, 267 U.S. at 539, 45 S.Ct. at 395; *Sacher v. United States*, 343 U.S. 1, 8, 72 S.Ct. 451, 454, 96 L.Ed. 717 (1952).

Supreme Court decisions regarding the proper scope of summary contempt authority have been based upon a balancing of values. When the issue has arisen, the Court has weighed the specific due process right implicated in the circumstances of the case against the accepted justifications for summary contempt proceedings. Should the value of process weigh more heavily than the need for summary procedures, the Court has moved to protect accused contemnors and to correspondingly limit the contempt power. Should the value of process weigh less heavily in the circumstances of the case, the Court has refused to place additional limitations on contempt authority.

### 1. Vindication of Due Process

*Bloom v. Illinois, supra*, 391 U.S. at 198–200, 88 S.Ct. at 1480–1481, held that a

---

**7.** *See, Sedler*, The Summary Contempt Power and the Constitution: The View from Without and Within, 51 NYU L.Rev. 34 (1976).

**8.** This justification has been characterized both in specific, pragmatic terms—"to suppress disturbance or violence or physical obstruction or disrespect to the court," *ibid.*, and in more general, theoretical language—to vindicate "the majesty of the law, in its active manifestation," *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954), and to "maintain the dignity" of the court. *Johnson v. Mississippi*, 403 U.S. 212, 214, 91 S.Ct. 1778, 1779, 29 L.Ed.2d 423 (1971).

punishment of two years imprisonment could not be imposed without granting the accused contemnor a jury trial to determine guilt or innocence. In establishing the right to a jury trial for "serious" contempts, the Court found that values inherent in the right to a jury trial outweighed both the "courtroom decorum" and "efficiency" justifications for summary adjudication. The Court stated that, "when serious punishment for contempt is contemplated, rejecting a demand for a jury trial cannot be squared with the Constitution or justified by considerations of efficiency or the desirability of vindicating the authority of the Court." *Id.* at 208–09, 88 S.Ct. at 1485–1486.

*Codispoti v. Pennsylvania, supra,* 418 U.S. at 516–17, 94 S.Ct. at 2693–94 (1974) carried forth the logic of *Bloom* in extending the accused contemnor's right to a jury trial. This case involved two defendants who, after the conclusion of their trial on other criminal charges, had been convicted and sentenced on several counts of contempt. No single contempt conviction carried more than six months imprisonment, but when the consecutive sentences were aggregated each defendant had to serve approximately three years. The Court reversed the defendants' convictions based on deprivation of the opportunity for a jury trial. In the circumstances of posttrial contempt convictions, the "deep commitment of the Nation to the right of a jury trial in serious criminal cases" was found to override any justification for summary procedures. *Ibid.*

Similarly, *Taylor v. Hayes, supra,* 418 U.S. at 498–501, 94 S.Ct. at 2703–2704, held that an accused's right to notice and hearing must be observed when judgment and sentencing of the contempt are postponed until after the proceeding in which the contemptuous act occurred. The Court found that the justification of maintaining courtroom order is not nearly so compelling when final adjudication and sentencing take place after trial. With respect to the efficiency justification, Justice White wrote that he was not persuaded that the additional time and expense involved in notice

and hearing justified depriving a contemnor of these elementary due process protections. *Id.* at 501, 94 S.Ct. at 2704.

### 2. *Vindication of the Contempt Power*

In other circumstances involving different due process rights, the balance between the values of procedural protections and the need for summary contempt adjudication has produced a different result. *Taylor v. Hayes, supra,* while establishing a right to notice and hearing in posttrial contempt adjudications, noted that a full-scale trial was not appropriate. 418 U.S. at 500, 94 S.Ct. at 2704. The Court relied on the efficiency justification, observing that the contemptuous act has usually occurred before the judges own eyes and that a reporter's transcript is available. *Ibid.*

In *Codispoti v. Pennsylvania, supra,* 418 U.S. at 514, 94 S.Ct. at 2692, the Court refused to extend the right to a jury trial beyond "serious" contempts adjudicated and sentenced *posttrial.* The right to a jury trial does not counterbalance the need for courtroom order when a judge summarily adjudicates and punishes petty contempts *during trial*—even if the punishment imposed for the separate contemptuous acts exceeds six months. *Id.* Justice White explained by citing the "[need] to maintain order in the courtroom" and the "integrity of the trial process in the face of an 'actual obstruction of justice.' "

### 3. *The Need for Courtroom Order as a Factor in Resolving Conflicts*

*Codispoti v. Pennsylvania, Taylor v. Hayes* and *Bloom v. Illinois* are instructive with regard to the issue before us in this case. From these cases it is apparent that the need to maintain courtroom order has often been the central factor in Supreme Court resolutions of conflicts between due process and the contempt power. The right to notice and hearing established in *Taylor v. Hayes,* and the jury trial right established in *Codispoti v. Pennsylvania,* both hinged upon reasoning that the need to maintain courtroom order is much less

when the judge postpones adjudication and sentencing of the contempt until after trial.

Despite the Court's emphasis on the importance of maintaining courtroom order, the factor has not been an absolute in relevant Supreme Court decisions. *Bloom v. Illinois* held that the right to a jury trial for "serious" contempts prevails over the need for immediate action in restoring courtroom order.

> We cannot say that the need to further respect for judges and courts is entitled to more consideration than the interest of the individual not to be subjected to serious criminal punishment without the benefit of all the procedural protections worked out carefully over the years and deemed fundamental to our system of justice. Genuine respect, which alone can lend true dignity to our judicial establishment, will be engendered, not by the fear of unlimited authority, but by the firm administration of the law through those institutionalized procedures which have been worked out over the centuries.
>
> We place little credence in the notion that the independence of the judiciary hangs on the power to try contempts summarily.

391 U.S. at 208, 88 S.Ct. at 1486. Conflicts between the contempt power and due process concerning issues other than the right to an unbiased tribunal cannot necessarily be resolved by looking only to the need for judicial authority. With this in mind, we now turn to the specific conflict at issue in this case.[9]

### C. Bias Versus the Need for Authority

Adjudication before a neutral and unbiased tribunal stands as one of the most fundamental of due process rights. The Supreme Court has observed,

> The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudi-

cative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

> The requirement of neutrality has been jealously guarded by this Court.

(citations omitted) *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 243, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980). The Court has also long recognized that, as with other due process values, use of the summary contempt power can seriously compromise the right to an unbiased tribunal. *See e.g., Cooke v. United States, supra,* 267 U.S. at 539, 45 S.Ct. at 395; *Offutt v. United States, supra,* 348 U.S. at 14, 75 S.Ct. at 13; *Bloom v. Illinois, supra,* 391 U.S. at 202, 88 S.Ct. at 1482.

*Offutt, supra,* 348 U.S. at 12, 75 S.Ct. at 12, vindicated the right of a contemnor to an unbiased tribunal. In *Offutt, supra,* 348 U.S. at 12, 75 S.Ct. at 12, the trial judge had made twelve findings of contempt against an attorney. Those findings came at the close of the trial in which the contemptuous acts occurred. In reversing the contempt citations, the Supreme Court observed that while sitting in judgment on a misbehaving lawyer, "a judge should not himself give vent to personal spleen or respond to a personal grievance." *Id.* at

---

**9.** Although the Supreme Court decided *Bloom* before *Codispoti* and *Taylor v. Hayes,* the Court has never questioned the holding or reasoning of *Bloom.* In fact, both *Codispoti,* 418 U.S. at

512, 515, 94 S.Ct. at 2691, 2692, and *Taylor v. Hayes,* 418 U.S. at 497, 501, 94 S.Ct. at 2702, 2704, relied upon *Bloom.*

14, 75 S.Ct. at 13. The Court voiced its agreement with the Court of Appeals that the record demonstrated "bias and a lack of partiality." *Id.* at 16, 75 S.Ct. at 14.

■ In *Mayberry, supra*, the Court again moved to preserve the right to an unbiased tribunal in criminal contempt proceedings. As in *Offutt*, contempt convictions rendered at the conclusion of a trial fell before a claim of judicial prejudice. Stressing that the defendant had made personal verbal attacks against the trial judge, the Court held that the Due Process Clause of the Fourteenth Amendment required that contempt proceedings be held before a "judge other than the one reviled by the contemnor." Justice Douglas, writing for the Court, qualified the holding, however.

> Generalizations are difficult. Instant treatment of contempt where lawyers are involved may greatly prejudice their clients but it may be the only wise course where others are involved. Moreover, we do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case. Where, however, he does not act the instant the contempt is committed, but waits until the end of the trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place.

400 U.S. at 463–64, 91 S.Ct. at 504. He further noted that the trial judge in that case "could, with propriety, have instantly acted, holding petitioner in contempt...." Thus, just as in other areas where due process collides with the contempt power, the timing of the judge's action constitutes an important guideline for resolving the conflict between the contempt power and the right to an unbiased tribunal.

We do not, however, view *Mayberry* and its emphasis on timing as establishing a rule for all claims of bias in contempt proceedings. The Court itself noted that the *Mayberry* facts differed from those in other cases involving bias in contempt judgments. Unlike the judge in *Offutt* the judge in *Mayberry* "was not an activist seeking combat." *Id.* at 465, 91 S.Ct. at 505. Indicia of prejudice that led the *Offutt* Court to conclude that the judge harbored actual bias did not exist in *Mayberry*. Rather, the highly personal aspersions leveled at the *Mayberry* trial judge carried "such a *potential* for bias as to require disqualification." *Id.* at 466–67, 91 S.Ct. at 505 (emphasis supplied) (distinguishing the case from *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964)). The *Mayberry* Court stated that, "[n]o one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." 400 U.S. at 465, 91 S.Ct. at 505. The Court's decision did not turn on proof of actual bias, but instead centered around a "presumption" of bias. *See United States v. Meyer*, 462 F.2d 827, 842 (D.C.Cir. 1972).

Weighing the danger of bias against the need for summary procedures when judgment comes at the end of trial, the *Mayberry* Court found the right to an unbiased tribunal overriding. It established the following relatively narrow prophylactic rule: a judge, the target of extreme insolence, vilification and insult, must pass contempt proceedings to another judge if the original judge does not adjudicate and punish the contemptuous act during trial. An equally narrow corollary to that rule also emerged from the case: "when bias is presumed solely from the contemnor's personal attacks on the judge, this potential bias does not overcome the need for judicial authority to maintain courtroom order."[10]

---

**10.** *Taylor v. Hayes, supra,* 448 U.S. at 504, 94 S.Ct. at 2706, also held that a defendant, convicted of contempt after trial for acts committed during trial, was entitled to be tried by a judge other than the one who witnessed the contempt. This case emphasized that the "likelihood of bias or appearance of bias," could create the need for an outside judge to preside over a contempt charge. *Id.* at 502, 94 S.Ct. at 2705. In that respect—by its emphasis on the appearance of bias rather than actual bias—*Taylor* closely parallels *Mayberry*. *Taylor* also represents an extension of *Mayberry,* however, in its focus on indicia of bias other than the defendant's abusive remarks. The Court stated that the critical factor in the record was the charac-

■ The State in this case argues that this latter corollary establishes a rule applicable to all claims of bias in punishing contempt. Under the State's reasoning, an allegation of bias could never justify reversal if the judge acted during trial in adjudicating and sentencing the contempt. In support of this reasoning the State cites *Farmer v. Strickland, supra,* 652 F.2d at 436–39, where a Georgia court's use of summary contempt proceedings was upheld. In that case the habeas petitioner claimed a due process violation because, *inter alia,* the judge who was the target of the contumacious conduct also adjudicated and sentenced the contempt. In ruling against the bias claim the *Farmer* Court explicitly considered *Mayberry's* emphasis on whether punishment for contempt occurs during or after trial. The facts underlying the bias claim closely paralleled those in *Mayberry*; the claim of prejudice rested almost totally on the contemnor's conduct towards the judge. The *Farmer* Court, in fact, observed that "the judge did not demonstrate any bias towards the petitioner's conduct." 652 F.2d at 439. Given evidence that established at most some potential for bias, the Circuit Court applied *Mayberry's* corollary regarding the appropriateness of instant action to maintain order. *Farmer,* therefore, represents only an application of *Mayberry* and not an extension. It does not establish the need to maintain courtroom order as the only relevant value, the consideration of which resolves all claims of judicial bias.

We decline to take such a step today. Our earlier analysis revealed that the need to maintain courtroom order is not an absolute in all clashes between due process and the contempt power. *See supra* at 738 F.2d at 1210. Similarly, we do not view the "courtroom decorum" justification for summary procedures as conclusive in all contempt cases involving the right to an impartial tribunal. Although the Supreme Court has never, based on judicial bias,

reversed a contempt conviction rendered during trial, the Court has never indicated that immediate action on a contempt *precludes* a reversal for bias. Moreover, despite numerous opportunities to do so the Eleventh Circuit and the predecessor Fifth have never held the need for courtroom order to be solely determinative in allegations of judicial bias. In cases upholding contempt convictions rendered during on-going judicial proceedings against bias claims, the Court has repeatedly inquired into the existence of personal embroilment. *See Farmer v. Strickland, supra,* 652 F.2d at 437–39; *see also Howell v. Jones,* 516 F.2d 53, 59 (5th Cir.1975), *cert. denied,* 424 U.S. 916, 96 S.Ct. 1116, 47 L.Ed.2d 321 (1976); *Theriault v. United States,* 481 F.2d 1193, 1196 (5th Cir.), *cert. denied,* 414 U.S. 1114, 94 S.Ct. 847, 38 L.Ed.2d 742 and *sub nom. Theriault v. Mobile City Jail,* 414 U.S. 1115, 94 S.Ct. 847, 38 L.Ed.2d 742 (1973).

■ The circumstances of the instant case are very different from those in *Mayberry* or in *Farmer.* The record in this case is replete with evidence that the trial judge had a pre-existing and very strongly held dislike for the petitioner. At different points during the trial, the judge referred to the petitioner as "rude and nasty," and as "acting like an animal;" the judge repeatedly said he was "sick of" the petitioner. He referred to petitioner's law partner as a "little creep," and said that he was "sick of" him. Shortly before finding petitioner guilty of contempt and sentencing him, the trial judge said that for ten years the petitioner had had a "nauseating effect" upon him and every other court in the courthouse. We find it especially significant that the judge himself felt compelled, apparently because of his feelings towards the petitioner, to recuse himself from any further proceedings involving petitioner's client. He said, "this Court feels that it can't give the defense—I should say the

ter of the judge's response to misbehavior during the trial. *Id.* at 504 n. 10, 94 S.Ct. at 2706 n. 10. *See also Johnson v. Mississippi, supra,* 403 U.S. at 216, 91 S.Ct. at 1780 (1971) (judge's

intemperate remarks and fact that he was a losing party in a suit involving the contemnor required contempt hearing before another judge).

defendant—a fair trial." The trial judge had such contempt for the petitioner that the judge was incapable of representing the impersonal authority of law necessary for fair adjudication. *Offutt v. United States, supra,* 348 U.S. at 16, 75 S.Ct. at 14. Based on the record we feel firmly convinced that the trial judge was severely prejudiced against petitioner.

Although the trial judge adjudicated and sentenced the contempt during the trial, his doing so clearly denied petitioner an unbiased tribunal. While we must keep in sight the need for order in the courtroom, we must at the same time see that the constitutional rights of a defendant accused of contempt are not disordered or ignored. Under the circumstances of this case the right to an unbiased tribunal outweighs countervailing values.[11] Our approval of a contempt conviction, where the presiding judge was obviously prejudiced against the contemnor, would weaken rather than strengthen the dignity of the courts. Where a contemnor claims on appeal that he was deprived of the right to an impartial tribunal, the reviewing Court must examine the record for indications of serious bias—bias that would prevent the fair administration of justice. If after examining the record, the reviewing court forms a definite and firm[12] conviction that

the presiding judge harbored such bias towards the contemnor, the contempt convictions must be overturned. *Cf. Hamm v. Members of the Board of Regents of the State of Florida,* 708 F.2d 647, 651 (11th Cir.1983) (judge's remarks may demonstrate such pervasive bias and prejudice as to require reversal of civil judgment). Because we have reached such a conclusion in this case, we affirm the district court's grant of the petition for habeas corpus; any further proceedings on the contempt charge must be conducted before a judge other than the one who originally adjudicated and sentenced the contempt.

AFFIRMED.

TJOFLAT, Circuit Judge, dissenting:

The majority finds that Sandstrom's claim that the judge cited and sentenced him for contempt in violation of the federal constitution was exhausted in the state courts. They do so on the theory that, while Sandstrom did not raise his federal constitutional claim during his contempt proceedings or in his direct appeal from those proceedings, the state appellate court reached out and addressed it in its dispositive opinion. I do not agree that its opinion can reasonably be read as addressing the

---

11. In many cases where the trial judge acts immediately after the contumacious conduct, the need to restore and maintain courtroom order is an obvious concern. Despite the fact that the trial judge acted during trial in this case, other circumstances make that concern less compelling than usual. *Codispoti v. Pennsylvania,* 418 U.S. at 518, 94 S.Ct. at 2694, suggests that appellate courts should look to the particular facts in each case to determine if a summary contempt conviction during trial was warranted. Examination of the facts here leads us to conclude that punishing the petitioner was as much a motive for the contempt citation as was restoring courtroom order. After sentencing appellant, the judge said the following:

> Mr. Sandstrom will go to jail, and he will remain there until an appeal is filed or a petition is filed by the Appellate Court, and this Court will stay in recess until such time as something happens, the Appellate Court orders me to go back to trial, declare a mistrial, release Mr. Sandstrom, or go on with the trial, whichever.

Record, Vol. I at 307. We do not hold that the judge's decision to immediately jail the petitioner was necessarily an inappropriate response to petitioner's behavior. The judge's decision means only that the value of *restoring* order in an ongoing judicial proceeding weighs more lightly than it otherwise might.

Similarly, our holding today is not in any way an approval of petitioner's conduct; it is not an indication that this Court will allow a judge to be driven out of a case by unscrupulous attorneys or litigants. When a judge's comments and behavior reflect a strong bias against a party over whom he sits in judgment, the judge drives himself out of the case.

12. *Cf. United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (establishing "definite and firm conviction that a mistake has been committed" as prevailing standard for "clearly erroneous" review); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 840 (11th Cir.1983).

federal constitutional claim Sandstrom now presents; accordingly, I dissent.

The majority determines that the Florida District Court of Appeal decided Sandstrom's fourteenth amendment due process claim because the court alluded to a U.S. Supreme Court case discussing the federal constitutional standard for disqualification of a judge as presenting the relevant case law. The majority relies on *Booker v. Wainwright*, 703 F.2d 1251 (11th Cir.1983), as indicating that where a state court cites a federal case articulating a federal constitutional rule, without describing that rule as analogous to the relevant state law rule, the state court is deemed to have addressed the state law rule in addition to the federal constitutional rule. In *Booker*, however, one key fact was present that rendered the above proposition reasonable; in that case, the petitioner had raised the federal constitutional claim, as well as the state law claim, in his brief before the state court. Thus, the federal court could conclude that the state court had ruled on the claims presented to it.

Here, petitioner never pointed out to the Florida District Court of Appeal that he was presenting a federal constitutional claim. It is therefore just as likely that that court, in quoting from *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), was only articulating a state rule, *i.e.*, adopting its view of the federal constitutional standard as the state rule on judge disqualifications.

The exhaustion requirement is vital to the integrity of the judicial system. *See Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Darden v. Wainwright*, 725 F.2d 1526, 1533 (11th Cir. 1984) (Tjoflat, J. dissenting). In a case like this one, where the petitioner has not "fairly presented" the substance of his federal habeas corpus claim to the state courts, *see Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), and the state courts have not unequivocally indicated that petitioner has presented such a claim, the importance of enforcing the policies behind the exhaustion requirement should

militate against finding the asserted federal claim to have been exhausted.