David Lee POWELL, Appellant,

v.

The STATE of Texas, Appellee.

No. 67630.

Court of Criminal Appeals of Texas, En Banc.

July 8, 1987.

Will Gray, Houston, for appellant.

Ronald Earle, Dist. Atty., Philip A. Nelson, Jr., Asst. Dist. Atty., Austin, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

Appellant was convicted of the capital murder. The jury assessed his punishment at death.

Shortly after midnight on May 18, 1978, Austin police officer Ralph Ablanedo, was on duty. At 12:41 a.m. Polly Bittick, the police radio dispatcher on duty, received a call from Ablanedo requesting a check through the National Criminal Information center (NCIC) on a person named Sheila Margaret Meinert, to determine if she was wanted for any offense. Ablanedo stated that he was in the 900 block of Live Oak Street. He also gave a vehicle identification number (VIN), and asked for a computer check to determine if the vehicle bearing that number was stolen. Bittick called back to advise that the vehicle inquiry was still pending, and that Meinert was not wanted by local authorities. At 12:46 a.m., Ablanedo radioed a request for a check on David Lee Powell, the appellant. Bittick's computer check showed a "possible wanted" on Powell, and she dispatched officer Bruce Mills to assist Ablanedo. This she stated was normal procedure when a computer check determined that a person was a "possible wanted." Ablanedo called back to ask what Bittick had on appellant, and she told him, ". . . a possible misdemeanor theft." Shortly thereafter, Bittick heard something like a scream over the radio, and then the voice of Mills calling for more patrol units. Mills then advised that he needed an ambulance, and stated there was an officer "down." Mills stated that there was a red Mustang involved, going eastbound, and that the occupants were armed.

Other witnesses who resided in the 900 block of Live Oak Street described seeing a red Mustang automobile stopped in that block, with a police car behind it. The police car had its flashing lights on. A police officer and a female were seen standing between the two cars. Then there was the sound of gunshots, and the Mustang drove rapidly away. Appellant was identified as having been sitting in the back seat of the Mustang as the shots were fired, with another person sitting in the driver's seat. The Mustang stopped further up the street, and appellant moved to the front passenger side.

Officer Joe Villegas heard the radio description of the red Mustang, and concluded that a particular apartment complex

nearby on Oltorf Street would be a likely hiding place. Checking the parking lot of the complex with his spotlight, Villegas saw a red Mustang with two occupants. As he pulled into the parking lot, he was met with a hail of automatic weapon fire coming from the right rear of the Mustang. He stopped, jumped out of his car, and returned the fire. Shortly thereafter, he saw a man running in a crouched position from the Mustang, south toward Travis High School. The man turned back and looked at Villegas from a distance of 15 or 20 yards, and Villegas later identified the man as appellant. Appellant disappeared around the corner of the high school.

Sergeant Darrell Gambrell joined Villegas during the firing at the apartment complex and saw a person get out of the Mustang and lie down next to it as the other person was running toward the high school. Gambrell and Officer Tommy Foree reached the person lying down, handcuffed her and searched her for weapons. The person was Sheila Meinert, appellant's companion. Inside the Mustang, the officers found an AK–47 automatic rifle, which was still hot to the touch from recently having been fired. It was later shown that Ablanedo had been shot with a Chinese version of a Russian AK–47 automatic rifle.

Officer Bruce Boardman came upon the apartment complex as the firing was going on. He saw a person with long hair come up and make a throwing motion toward Officer Villegas and those with him. An unexploded hand grenade was later found about ten feet from Villegas' patrol car. The safety pin had been removed. An officer found a pin similar to the type used in such grenades lying on the ground approximately three feet from the passenger door of the Mustang. At dawn appellant was found under a bush at Travis High School by a school patrolman. He offered no resistance.

After the State rested, appellant raised the defense of insanity at the time of the offense. See V.T.C.A., Penal Code, Section 8.01. His evidence on this issue came chiefly from Dr. Emanuel Tenay, a psychiatrist. Dr. Tenay testified that he had conducted lengthy interviews with appellant, members of his family, and his friends and acquaintances, and had reviewed a sizeable amount of appellant's personal writings. In Tenay's opinion, appellant had been insane on May 18, 1978, at the time officer Ablanedo was shot and killed. He believed that on that occasion appellant was suffering from paranoid schizophrenia, a form of psychosis. Dr. Tenay believed that this condition was largely the result of prolonged use of psychoactive drugs such as amphetamine and methamphetamine. There was other evidence that appellant had been heavily involved in the sale and perhaps manufacture of amphetamines, or "speed."

The State sought to rebut this defensive theory through the testimony of Dr. Richard Coons, a psychiatrist, and Dr. George Parker, a psychologist. Dr. Coons met with and examined appellant on four occasions: on May 18, 1978, some 12 hours after the shooting, and again on May 23, May 29 and June 4, 1978. The first meeting occurred pursuant to an order signed by the trial court on the morning of the shooting. This order provided that appellant undergo examination and testing by Dr. Coons and a practicing psychologist of his choice to determine appellant's competency to stand trial and sanity at the time of the alleged offense. This order was made upon the motion of the State. Dr. Coons testified that based on his several examinations of appellant, there was no indication that appellant had been insane on May 18, 1978. He specifically disclaimed having observed any evidence that appellant was suffering from paranoid schizophrenia.

Dr. George Parker, a clinical psychologist practicing in Austin, testified that he had met with appellant on June 25 and July 2, 1978, at the Travis County jail. Each meeting lasted two to two and a half hours. He administered several standardized psychological tests to appellant, to determine intelligence, to detect the presence of any organic neurological disorders, and to examine personality functions. He was able to detect no organic difficulties. He found

appellant to be very intelligent and articulate, with an IQ of 128. He characterized appellant's personality as impulsive, high-energy, rebellious, non-conforming, immature and somewhat egocentric. He stated the opinion that on May 18, 1978, appellant had been sane under Texas law, and that the testing showed no indication of paranoid schizophrenia. The jury's verdict at the guilt stage of the trial obviously indicates that it found the State's evidence more persuasive on the insanity issue.

At the penalty stage of the trial the State put on evidence that in January 1978, after having been evicted from an apartment for nonpayment of rent and having had the personal property therein impounded in December of 1977 by the landlord, George Sandlin, appellant had broken into Sandlin's storage facility to remove his belongings. Lee Ramos, a maintenance employee who was driving a Sandlin truck, happened upon this apparent burglary and stopped his truck. Appellant advanced upon him with a knife, and when Ramos fled in his truck, appellant chased him all the way home and then tried to get him to come outside. Ramos declined.

Also admitted as punishment evidence was testimony that a search of appellant's house the day after the shooting revealed a hand grenade, two cannisters of ether, a box of .45 caliber ammunition, a box of 7.62 mm Russian ammunition, and a set of die used in processing ammunition for an AK–47 Russian automatic rifle. Also found in the kitchen and seized were various beakers, chemicals and paraphernalia. A photograph of these items as they appeared in the kitchen was admitted into evidence. The police conducting the search also seized three small vials containing methamphetamine, with a total weight of approximately one gram.

Drs. Coon and Parker were called by the State and permitted, over objection, to testify on the issue of future dangerousness based on their examinations, interviews and testings of appellant. Both testified that in their opinion there was a "high" probability appellant would commit future acts of violence that would constitute a continuing threat to society.

Appellant called Ronnie Earle, the Travis County district attorney, who testified that appellant through his counsel had volunteered the information that there was a hand grenade in his house. Edith Roberts, one of appellant's counsel, also testified to the voluntary surrender of the grenade.

■ In his first point of error appellant complains that prospective juror Catherine Simmons was improperly excused for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). Since appellant failed to object to the exclusion for cause of prospective juror Simmons, error, if any, has been waived. *Modden v. State*, 721 S.W.2d 859 (Tex.Cr.App. 1986); *Mann v. State*, 718 S.W.2d 741 (Tex. Cr.App.1986); *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr.App.1984).

In his second point of error appellant contends that Dr. Coons and Dr. Parker were improperly permitted by the court, over objection, to testify for the State at the penalty stage of the trial and to express their opinion on the issue of future dangerousness. Appellant relies upon *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) and *Battie v. Estelle*, 655 F.2d 692 (5th Cir.1981).

The Supreme Court, in *Estelle v. Smith*, supra, speaking through Chief Justice Burger, held that where prior to the in-custody psychiatric examination ordered by the court to determine the defendant's competency to stand trial the defendant had not been warned that he had the right to remain silent, and that any statement made could be used against him at the sentencing proceeding, admission at the penalty stage of a capital felony trial of a psychiatrist's damaging testimony on the crucial issue of future dangerousness violated the Fifth amendment privilege against compelled self-incrimination because of a lack of appraisal of rights and a knowing waiver thereof, the death penalty imposed could not stand.

The Court further held that the Sixth Amendment's right to counsel was violated where defense counsel was not notified in advance that the psychiatric examination would encompass the issue of future dangerousness and there was no affirmative waiver of the right to counsel.

In *Estelle*, the Dallas County district judge, on his own motion, appointed Dr. James Grigson to examine the defendant on the issue of his competency to stand trial. Article 46.02, V.A.C.C.P. Dr. Grigson examined the defendant without giving any warnings regarding his Fifth Amendment privilege against self-incrimination and did not notify the defense counsel that the psychiatric examination would encompass the issue of the defendant's future dangerousness, nor was the defendant accorded the assistance of counsel in determining whether to submit to such examination, etc. After the examination, Dr. Grigson reported to the court that Smith was competent to stand trial. The case went to trial with no issue being raised as to the defendant's competency to stand trial or as to the defensive issue of insanity at the time of the alleged offense. After Smith was convicted at the guilt stage of the bifurcated trial of the capital murder, Dr. Grigson was called by the State at the penalty stage of the trial to testify that, based upon his examination, he considered the defendant Smith a severe sociopath who would commit violent acts in the future "if given the opportunity to do so." The jury subsequently returned affirmative answers to the special issues submitted under Article 37.071(b), V.A.C.C.P., and the trial court assessed the death penalty.

In the instant case appellant was taken before a magistrate on the day of his arrest and warned of the accusation against him. A complaint was filed five days later on May 23, 1978, and the first indictment was presented on the same date. A second indictment was returned on June 29, 1978. Shortly after appellant's apprehension on May 18, 1978, Steve Edwards, assistant district attorney, filed a motion requesting the court to order a psychiatric examination, claiming he had information which raised questions of the appellant Powell's

mental competency to stand trial and his sanity at the time of the commission of the offense. The same day the trial court ordered a psychiatric examination of appellant to be made by Dr. Richard Coons and a psychologist of his choice. As noted above, this examination was for the purpose of determining both appellant's competency to stand trial and his sanity at the time of the offense. On May 18, 1978, one of appellant's counsel, Edith Roberts, was appointed. On May 23 and 24, 1978, Roberts had telephone conversations with Dr. Coons who obtained her permission for Dr. Parker to do some psychological testing of appellant. The record reflects that at no point in time did Coons or Parker inform appellant or his attorneys that they were asked to or had examined appellant on the issue of future dangerousness. Nor did Coons or Parker give appellant, who was in custody, *Miranda* warnings.

At first glance, this case seems to be ruled by the Supreme Court's decision in *Estelle*. However, a thorough review of the record and a careful reading of both *Estelle* and *Battie* bring us to the conclusion that the instant case is distinguishable and is a case of first impression. The distinguishing factor is that in the instant case appellant argued the affirmative defense of insanity during the guilt-innocence phase of the trial through the testimony of Dr. Tenay.

 Language in *Battie v. Estelle*, 655 F.2d 692 (5th Cir.1981), seems to suggest that once a defendant introduces testimony on the issue of insanity at the guilt-innocence phase of the trial, he in fact waives his Fifth and Sixth Amendment rights implicated by psychiatric testimony not only at the guilt-innocence phase of the trial but also at the punishment phase of the trial.

"The State also contends that petitioner waived his fifth amendment (sic) privilege by requesting a psychiatric examination to determine his competency to stand trial and his sanity at the time of the commission of the crime. This argument however confuses the use of psy-

chiatric examinations by the defense or the State to determine a defendant's competency to stand trial with the use of a psychiatric examination by the defense or the State to ascertain the defendant's insanity at the time of the crime. Each use of psychiatric testimony raises questions different from those raised by the other and different doctrines have developed to account for these different problems.

"The use of a psychiatric or psychological examination to determine a defendant's competency to stand trial is a separate matter as far as the fifth amendment privilege is concerned and is distinct from the use of a psychiatric or psychological examination to determine the defendant's culpability or responsibility for the crimes charged against him. The State's use of the results of a competency examination does not infringe upon a defendant's fifth amendment privilege because it does not assist the State in proving any of the elements necessary to support the imposition of a criminal punishment under state law. See *Estelle v. Smith,* supra, 451 U.S. at 465, 101 S.Ct. at 1874–75. Had Dr. Patterson's examination been used only to determine petitioner's competency to stand trial 'no Fifth Amendment issue would have arisen.' Id. at 465, 101 S.Ct. at 1874; id. at 469, 101 S.Ct. at 1876.

"*However, when the same type of examination is used to determine a defendant's culpability or responsibility for the crimes charged against him the fifth amendment privilege is involved because the use of a psychiatric or psychological examination in this context may assist the State in establishing the basis for imposition of a criminal punishment.*" 655 F.2d at 700–701. (footnotes omitted) (emphasis applied)

. . . . .

"The State contends however that a defendant's mere submission to a psychiatric or psychological examination constitutes a waiver of the fifth amendment privilege. But the waiver doctrine is inapplicable, as here, when the defendant does not introduce the testimony of mental health expert on the issue of a mental state relevant to the offense or a defense raised by the evidence in the case. Accordingly, a defendant can invoke the protection of the privilege when he does not introduce mental health expert testimony. Submitting to a psychiatric or psychological examination does not itself constitute a waiver of the fifth amendment's protection." 655 F.2d at 702.

In rejecting the State's contention regarding waiver by virtue of requesting a competency hearing, the Fifth Circuit implicitly endorsed the concept of waiver by arguing the affirmative defense of insanity. Thus once the defendant has argued the affirmative defense of insanity by use of testimony from a mental health expert, the Fifth Amendment privilege accompanying any psychiatric testimony has been waived. Since in a capital murder case in Texas the information testified to by the mental health experts goes to assist the State in proving up one of the elements necessary to support the imposition of capital punishment under state law—specifically, the issue of future dangerousness—under *Battie,* the appellant, in presenting such an insanity defense has waived his Fifth Amendment privilege.

■ Furthermore, in addition to waiving the privilege by introducing psychiatric testimony on the issue of insanity at the guilt-innocence phase of the trial, our review of the record indicates that appellant waived the privilege by several of his actions at the punishment phase of the trial. First, during the preparation of the charge on punishment, appellant requested that the following instructions be included in the charge:

"You are further instructed that you may consider any evidence you have heard during both phases of this case as the same may mitigate or impair David Lee Powell's ability to conform his acts to the law even though such mitigating facts may not be insanity as herein before defined to you."

. . . . .

"You are further instructed that in answering the questions required of you in this charge, you may consider all of the evidence which you heard in the initial phase of this case relating to the Defendant's insanity; and whether or not the same proofs (sic) by a preponderance of the evidence, diminished capacity."

. . . . .

"Do you find from a preponderance of the evidence that the intent or knowledge as those terms have heretofore been defined by the Court for you of David Lee Powell on May 18, 1978, was diminished by toxic psychosis, methane amphetamine-induced (sic)? Answer yes or no."

Second, during closing argument at the punishment phase of the trial, appellant's attorney made the following argument:

"But when we talk about psychiatric testimony, I just really wonder if you missed the whole thing. Dr. Coons [the State expert], four years experience; Dr. Tenay [the defense expert], twenty years experience; Dr. Coons, no medical history on the patient; Dr. Tenay, complete medical history; Dr. Coons, no forensic medicine in homicide (sic); maybe had heard a lecture and been around a little but no courses as such; Dr. Tenay, the leading authority in the United States on forensic medicine on homocide (sic)." [material in brackets added]

Clearly, the defense wished the jury to consider the psychiatric testimony introduced by the appellant at the guilt-innocence phase of the trial and compare it with the psychiatric and psychological testimony elicited from the State's experts at both the guilt-innocence phase of the trial and the punishment phase of the trial. It has long been the rule that in answering the special issues under Article 37.071, V.A.C.C.P., including the issue of future dangerousness, the jury may consider all of the properly admitted evidence at the first or guilt stage of the bifurcated trial, including the testimony of appellant's own psychiatrist on the issue of insanity as a defense. *Russell v. State,* 665 S.W.2d 771 (Tex.Cr.App.1983); *Garcia v. State,* 626 S.W.2d 46 (Tex.Cr. App.1981).

This is exactly the same situation this Court found in the case of *Penry v. State,* 691 S.W.2d 636 (Tex.Cr.App.1985). In *Penry,* the defendant raised the issue of insanity at the guilt-innocence phase and reintroduced all of the guilt-innocence testimony at the punishment stage. Judge Tom Davis wrote the following:

"It is clear from the jury argument of appellant's attorneys that they wanted the jury to reconsider *all* of the testimony relevant to the *insanity defense* at the punishment stage, and wanted the jury to consider it as to 'each of those special issues.' It is also clear from a reading of the record that appellant's jury arguments and reintroduction of guilt-innocence phase testimony were not a response to the testimony of Peebles and Vogtsberger [the State's experts]. Rather, throughout the entire trial, appellant relied heavily on his history of mental instability.

"Since appellant raised the issue of insanity at the guilt-innocence stage of the trial *and at the punishment hearing* with respect to *all* of the special issues, including future dangerousness, he effectively waived his Fifth and Sixth Amendment rights to complain about the future dangerousness testimony of Peebles and Vogtsberger, which testimony was based in part on psychiatric examinations of appellant during which insufficient warnings were given." 691 S.W.2d at 652. [material in brackets added]

We find Judge Davis' reasoning to be applicable to the instant case. See also *Griffin v. State,* 665 S.W.2d 762 (Tex.Cr.App.1983). Compare *Clark v. State,* 627 S.W.2d 693 (Tex.Cr.App.1981) (where the Court found no waiver of *Estelle* error even though the defendant had introduced psychiatric testimony at the punishment stage because such evidence was introduced in order "to meet, destroy or explain" the erroneously admitted psychiatric evidence).

█ Finally, we conclude that even if there was error in admitting the testimony of Drs. Coons and Parker, the error was harmless. True, Dr. Coon and Dr. Parker did give their opinions that appellant would

be violent in the future. But the jury had before them the details of the brutal killing of Officer Ablanado plus the attempted killing of other officers on the scene. They knew that appellant had armed himself not only with an AK–47 automatic rifle and a .45 automatic pistol but also a hand grenade which he did not hesitate in throwing at his pursuers. Other evidence introduced at the punishment stage of the trial showed that in January 1978, after having been evicted from an apartment for nonpayment of rent and having had his personal property contained in the apartment impounded, appellant broke into his landlord's storage facility to remove his belongings. Upon discovery by his landlord's maintenance man, appellant advanced upon the maintenance man with a knife and pursued the man all the way to his home. The evidence also showed that a search of appellant's house after the instant offense revealed a variety of ammunition, another grenade and several canisters of ether, which were described by an agent of the Bureau of Alcohol, Tobacco and Firearms as being "of an explosive nature."

We must conclude, as we did in *Satterwhite v. State,* 726 S.W.2d 81 (Tex.Cr.App. 1986), that:

"the properly admitted evidence was such that the minds of an average jury would have found the State's case sufficient on the issue of the 'probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society' even if [Dr. Coon's and Dr. Parker's] testimony had not been admitted. The admission of the testimony was harmless error beyond a reasonable doubt. *Sanne v. State,* 609 S.W.2d 762 (Tex.Cr.App.1980)." 726 S.W.2d at 93. [material in brackets supplied]

This point of error is overruled.

■ In his third point of error, appellant complains that the admission of the testimony of Dr. Coons and Dr. Parker at the penalty stage of the trial undermined the reliability of the fact-finding process. A review of the record reveals that there was no trial objection on this basis and thus nothing is presented for review. *Thomas v. State,* 701 S.W.2d 653 (Tex.Cr.App.1985).

Appellant next complains that Article 37.-071, V.A.C.C.P., is unconstitutional because it contains no provisions for directing and instructing the jury's consideration of mitigating circumstances at the penalty stage of the trial, and is heavily weighed in favor of the prosecution by focusing the jury's consideration on aggravating circumstances. This contention has been addressed and overruled by this Court on several other occasions. *Anderson v. State,* 701 S.W.2d 868 (Tex.Cr.App.1985); *Penry v. State,* 691 S.W.2d 636 (Tex.Cr.App.1985); *Stewart v. State,* 686 S.W.2d 118 (Tex.Cr. App.1984). Appellant's brief contains nothing to persuade us that our prior rulings in this area have been wrong. This point of error is overruled.

■ Finally, appellant contends that he was denied fundamental fairness, due process and equal protection of the law in the admission of an unadjudicated extraneous offense at the penalty stage of his capital murder trial. Specifically, the defense complains about the attempted assault made by appellant upon Ramos, the maintenance man. Initially, we note that no objection was made to the admission of this evidence at trial and thus nothing is presented for review. *Crocker v. State,* 573 S.W.2d 190 (Tex.Cr.App.1978).

■ However, even if an objection had been made at trial, we would still be compelled to overrule this point of error. This argument has been considered and rejected in a number of cases. *Hogue v. State,* 711 S.W.2d 9 (Tex.Cr.App.1986); *Morin v. State,* 682 S.W.2d 265 (Tex.Cr.App.1983); *Williams v. State,* 622 S.W.2d 116 (Tex.Cr. App.1981). Appellant's fifth point of error is overruled.

Having found no reversible error, the judgment of the trial court is affirmed.

DUNCAN, J., concurs in the result.

ONION, Presiding Judge, dissenting.

In his second point of error[1] appellant contends that Dr. Coons and Dr. Parker were improperly permitted by the court, over objection, to testify for the State at the penalty stage of the trial and to express their opinion on the issue of future dangerousness. Appellant relies upon *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), a Texas case.

I do not believe this Court has any choice but to sustain appellant's second point of error and reverse the conviction.

The Supreme Court, in *Estelle v. Smith*, supra, speaking through Chief Justice Burger, held that where prior to the in-custody psychiatric examination ordered by the court to determine the defendant's competency to stand trial the defendant had not been warned that he had the right to remain silent, and that any statement made could be used against him at the sentencing proceeding, admission at the penalty stage of a capital felony trial of a psychiatrist's damaging testimony on the crucial issue of future dangerousness violated the Fifth Amendment privilege against compelled self-incrimination because of a lack of appraisal of rights and a knowing waiver thereof, the death penalty imposed could not stand.

The Court further held that the Sixth Amendment's right to counsel was violated where defense counsel was not notified in advance that the psychiatric examination would encompass the issue of future dangerousness and there was no affirmative waiver of the right to counsel.

It must be remembered that both the Fifth and Sixth Amendments are applicable to the states by virtue of the Fourteenth Amendment. See *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *Pointer v. State*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed. 2d 923 (1965); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963);

*Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972).

In *Estelle v. Smith*, supra, the Dallas County district judge, on his own motion, appointed Dr. James Grigson to examine the defendant on the issue of his competency to stand trial. See Article 46.02, V.A.C. C.P. Dr. Grigson examined the defendant without giving any warnings regarding his Fifth Amendment privilege against self-incrimination and did not notify the defense counsel that the psychiatric examination would encompass the issue of the defendant's future dangerousness, nor was the defendant accorded the assistance of counsel in determining whether to submit to such examination, etc.

After the examination, Dr. Grigson reported to the court that Smith (the defendant) was competent to stand trial. The case went to trial with no issue being raised as to the defendant's competency to stand trial or as to the defensive issue of insanity at the time of the alleged offense. After Smith was convicted at the guilt stage of the bifurcated trial of the capital murder, Dr. Grigson was called by the State at the penalty stage of the trial to testify that, based upon his examination, he considered the defendant Smith a severe sociopath who would commit violent acts in the future "if given the opportunity to do so." The jury subsequently returned affirmative answers to the special issues submitted under Article 37.071(b), V.A.C.C.P., and the trial court assessed the death penalty on appeal. The conviction was affirmed by this Court in *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976).

Having exhausted his state remedies, Smith sought federal habeas corpus relief and prevailed on the contentions identical to those raised at trial by this appellant in the instant cause. *Smith v. Estelle*, 445 F.Supp. 647 (N.D.Texas 1977). The Court of Appeals for the Fifth Circuit affirmed though modifying the decision. *Smith v. Estelle*, 602 F.2d 694 (5th Cir.1979). Subse-

---

1. In his second and third points (nee grounds) of error appellant complains of the admission of the testimony of Drs. Coons and Parker at the penalty stage of the trial. His third point complains that the admission of such testimony un-

dermined the reliability of the fact-finding process. There was no trial objection on this basis and nothing is presented for review on appellant's third point of error.

quently the United States Supreme Court affirmed the Fifth Circuit opinion as earlier noted.

In affirming the lower court in the said *Smith* case, the Supreme Court noted that Smith's future dangerousness was a critical issue at the penalty stage of the capital murder trial, and one upon which the State had the burden of proof beyond a reasonable doubt. [See Article 37.071(b) and (c), V.A.C.C.P.]; that the State, to meet its burden, used Smith's own statements unwittingly made without an awareness that

he was assisting the State's efforts to obtain the death penalty.[2]

Thus, the United States Supreme Court held that both the Fifth and Sixth Amendments of the United States Constitution are violated by a doctor's testimony on future dangerousness at the penalty stage of the trial when the opinion is based on questioning of a defendant in custody who is represented by counsel and the questioning is conducted without prior warning on the Fifth Amendment privilege and without opportunity for advice of counsel.[3]

2. The statements were made to the psychiatrist in what was supposedly a pretrial examination to determine competency to stand trial.

3. In *Smith* the Supreme Court wrote:
"In *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966), the Court acknowledged that 'the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.' *Miranda* held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' *Id.,* at 444, 86 S.Ct., at 1612. Thus, absent other fully effective procedures, a person in custody must receive certain warnings before any official interrogation, including that he has a 'right to remain silent' and that 'anything said can and will be used against the individual in court.' *Id.,* at 467–469, 86 S.Ct., at 1624–1625. The purpose of these admonitions is to combat what the Court saw as 'inherently compelling pressures' at work on the person and to provide him with an awareness of the Fifth Amendment privilege and the consequences of foregoing it, which is the prerequisite for 'an intelligent decision as to its exercise.' *Ibid.*
"The considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here. Respondent was in custody at the Dallas County Jail when the examination was ordered and when it was conducted. That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role

changed and became essentially like that of an agent of the State recounting unwarned statements made in a post-arrest custodial setting. During the psychiatric evaluation, respondent assuredly was 'faced with a phase of the adversary system' and was 'not in the presence of [a] person[ ] acting solely in his interest.' *Id.,* at 469, 86 S.Ct. at 1625. Yet he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death. He was not informed that, accordingly, he had a constitutional right not to answer the questions put to him.
"The Fifth Amendment privilege is 'as broad as the mischief against which it seeks to guard,' *Counselman v. Hitchcock,* 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892), and the privilege is fulfilled only when a criminal defendant is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence.' *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–1494, 12 L.Ed.2d 653 (1964). We agree with the Court of Appeals that respondent's Fifth Amendment rights were violated by the admission of Dr. Grigson's testimony at the penalty phase."
"A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to Dr. Grigson to establish his future dangerousness. If, upon being adequately warned, respondent had indicated that he would not answer Dr. Grigson's questions, the validly ordered competency examination nevertheless could have proceeded upon the condition that the results would be applied solely for that purpose. In such circumstances, the proper conduct and

In the instant case appellant was taken before a magistrate on May 18, 1978 and warned of the accusation against him as provided by Article 15.17, V.A.C.C.P. A complaint was filed on May 23, 1978, and the first indictment was presented on the same date. A second indictment was returned on June 29, 1978. Shortly after appellant's apprehension on May 18, 1978, Steve Edwards, assistant district attorney, filed a motion requesting the court to order a psychiatric examination, claiming he had

use of competency and sanity examinations are not frustrated, but the State must make its case on future dangerousness in some other way.

" 'Volunteered statements . . . are not barred by the Fifth Amendment,' but under *Miranda v. Arizona, supra,* we must conclude that, when faced while in custody with a court-ordered psychiatric inquiry, respondent's statements of Dr. Grigson were not 'given freely and voluntarily without any compelling influences' and, as such, could be used as the State did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them. *Id.,* at 478, 86 S.Ct., at 1630. These safeguards of the Fifth Amendment privilege were not afforded respondent and, thus, his death sentence cannot stand." (Footnotes omitted.)

In discussing the Sixth Amendment contention, the Supreme Court in *Smith* wrote:

"When respondent was examined by Dr. Grigson, he already had been indicated (sic) and an attorney had been appointed to represent him. The Court of Appeals concluded that he had a Sixth Amendment right to the assistance of counsel before submitted to the pretrial psychiatric interview. 602 F.2d, at 708–709. We agree.

"The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense.' The 'vital' need for a lawyer's advice and aid during the pretrial phase was recognized by the Court nearly 50 years ago in *Powell v. Alabama,* 287 U.S. 45, 57, 71, 53 S.Ct. 55, 60, 65, 77 L.Ed. 158 (1932). Since then, we have held that the right to counsel granted by the Sixth Amendment means that a person is entitled to the help of a lawyer 'at or after the time that adversary judicial proceedings have been initiated against him . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' *Kirby v. Illinois,* 406 U.S. 682, 688–689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion); *Moore v. Illinois,* 434 U.S. 220, 226–229, 98 S.Ct. 458, 463–465, 54 L.Ed.2d 424 (1977). And in *United States v. Wade,* 388 U.S. 218, 226–227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967), the Court explained:

" 'It is central to [the Sixth Amendment] principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.' (Footnote omitted.)

See *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). See also *White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961).

"Here, respondent's Sixth Amendment right to counsel clearly had attached when Dr. Grigson examined him at the Dallas County Jail, and their interview proved to be a 'critical stage' of the aggregate proceedings against respondent. See *Coleman v. Alabama,* 399 U.S. 1, 7–10, 90 S.Ct. 1999, 2002–2004, 26 L.Ed.2d 387 (1970) (plurality opinion); *Powell v. Alabama, supra,* 287 U.S., at 57, 53 S.Ct., at 60. Defense counsel, however, were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness, and respondent was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed.

"Because '[a] layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege,' the assertion of that right 'often depends upon legal advise from someone who is trained and skilled in the subject matter.' *Maness v. Meyers,* 419 U.S. 449, 466, 95 S.Ct. 584, 595, 42 L.Ed.2d 574 (1975). As the Court of Appeals observed, the decision to be made regarding the proposed psychiatric evaluation is 'literally a life or death matter' and is 'difficult . . . even for an attorney' because it requires 'a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, [and] of possible alternative strategies at the sentencing hearing.' 602 F.2d, at 708. It follows logically from our precedents that a defendant should not be forced to resolve such an important issue without 'the guiding hand of counsel.' *Powell v. Alabama, supra,* 287 U.S., at 69, 53 S.Ct., at 64.

"Therefore, in addition to Fifth Amendment considerations, the death penalty was improperly imposed on respondent because the psychiatric examination on which Dr. Grigson testified at the penalty phase proceeded in violation of respondent's Sixth Amendment right to the assistance of counsel." (Footnotes omitted.)

information which raised questions of the appellant Powell's mental competency to stand trial and his sanity at the time of the commission of the offense. The same day the trial court ordered a psychiatric examination of appellant to be made by Dr. Richard Coons and a psychologist of his choice to determine both appellant's competency to stand trial and his sanity at the time of the offense.

Dr. Coons examined the appellant on May 18th, 23rd and 29th and June 4, 1978. Dr. George Parker, a psychologist, tested the appellant on June 25th and July 2, 1978.

One of the appellant's counsel, Edith Roberts, was appointed on May 18, 1978. On May 23 and 24, 1978, she had telephone conversations with Dr. Coons who obtained her permission for Dr. Parker to do some psychological testing.

Neither Coons nor Parker informed appellant Powell nor any of his attorneys (Roberts, J.P. Darrouzet and Curt Beckcom) that they were asked to or had examined appellant on the issue of future dangerousness. And Powell and his attorneys did not request a psychiatric examination for that purpose nor indicate they intended to offer psychiatric evidence at the penalty stage of the trial.

On June 22, 1978 the appellant filed notice that he was presently incompetent to stand trial and that he would offer at trial "evidence of the insanity defense." Drs. Coon and Parker were appointed by the court on June 28, 1978 to make examinations. Dr. Coons made two reports dated July 15, 1978, addressed to the district attorney, finding appellant competent and sane. The issue of present incompetency was abandoned by the appellant on July 10, 1978. He did present the defense of insanity by the testimony of a Dr. Tenay, a psychiatrist. The State countered with the testimony of Drs. Coons and Parker that the appellant was sane when the alleged offense was committed.

At the penalty stage of the trial the State offered the testimony of Drs. Coons and Parker, over objection, as to the issue of future dangerousness. Based on their examinations, interviews and testing, they expressed the opinion there was a probability that the appellant in the future would commit criminal acts of violence that would constitute a continuing threat to society.

The record does not reflect that either Dr. Coons or Dr. Parker gave appellant, who was in custody, *Miranda* warnings or informed him that the examinations were also for the purpose of determining his future dangerousness and whether he presented a continuing threat to society. And his attorneys were not so informed that the examinations and testings were for this additional purpose. Except for Dr. Coons' interview with appellant on May 18, 1978, appellant, as in *Estelle v. Smith*, supra, was already under indictment when the examinations and testing took place. Thus his right to assistance of counsel had attached. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). While the attachment of that right does not encompass the right to have counsel actually present during the examination, *Estelle v. Smith*, supra, it does mean that appellant's counsel should have been informed that the examinations and testings would encompass the issue of future dangerousness. Additionally, the attachment of the right to counsel meant that appellant could have consulted with his attorney prior to the examinations and testings. There is nothing to indicate that appellant gave a knowing, intelligent, and voluntary waiver of his right to counsel, and a waiver will not be presumed from a silent record.

Thus there would appear to be violations of both appellant's Fifth and Sixth Amendment rights at the penalty stage of the instant capital murder trial.[4]

First, it should be considered whether appellant's objections, while timely, were sufficient. It is observed that prior to the testimony of Drs. Coons and Parker at the

---

**4.** It should be here noted that the appellant did not offer psychiatric or psychological testimony at the penalty stage. If he had, a different situation may have been presented. *Estelle v. Smith*, supra, 101 S.Ct. at 1878.

penalty stage of the trial appellant's three court-appointed counsel testified they had not been notified by the doctors or others that appellant was to be or had been examined on the question of future dangerousness. The objection was then made to the doctors' testimony. There was no request by appellant for either a psychiatric or psychological examination on the future dangerousness issue nor was there any showing appellant intended to use such testimony at the penalty stage of the trial.

The court overruled the objection on the basis of *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976), and *"Chambers v. State."* [568 S.W.2d 313 (Tex.Cr.App. 1978); now see *Ex parte Chambers*, 688 S.W.2d 483 (Tex.Cr.App.1984)] Appellant's counsel, in connection with the objection and the ruling, however, called the court's attention to *Smith v. Estelle*, 445 F.Supp. 647, wherein the federal district court set aside the judgment in the *Smith* case, relied upon by the trial court, upon violations of the Fifth and Sixth Amendments, and which was a forerunner of *Estelle v. Smith*, supra. Nevertheless, the court permitted Drs. Coons and Parker to testify at the penalty stage.[5]

If it can be argued that appellant's objection was not sufficient, I observe that the Supreme Court in *Estelle v. Smith*, supra, in footnote No. 12, said:

"For the reasons stated by the Court of Appeals, we reject the State's argument that respondent waived his Fifth Amendment claim by failing to make a timely, specific objection to Dr. Grigson's testimony at trial. See 602 F.2d at 702, n. 19. In addition, we note that the State did not present the waiver argument in its petition for certiorari. See this Court's rule 40(1)(d)(2) (1970)."

The Fifth Circuit Court of Appeals stated, in the cited footnote 19, in part as follows:

"The state asserts that Smith forfeited his fifth and sixth amendment claims by not raising them when he objected to Dr. Grigson's testimony at the sentencing phase. There are three sufficient answers. First ... Second, Texas courts interpreted the fifth and sixth amendments to permit testimony like Dr. Grigson's to be admitted, see, e.g., *Livingston v. State*, 542 S.W.2d 655, 661–662 (Tex.Cr.App.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); we have held that the apparent futility of objecting to an alleged constitutional violation excuses a failure to object. [citation omitted]. Third...."

I would reject any argument that appellant's contention on appeal should be overruled for lack of a timely and specific objection at trial.

Further, the 1981 opinion of the Supreme Court in *Estelle v. Smith*, supra, has been held to be retroactive, *Battie v. Estelle*, 655 F.2d 692 (5th Cir.1981);[6] *White v. Estelle*,

---

**5.** It would be difficult, except in hindsight, to fault the trial judge for his ruling at the time of trial.

Relying upon *Stultz v. State*, 500 S.W.2d 853 (Tex.Cr.App.1973), and *Patterson v. State*, 509 S.W.2d 857 (Tex.Cr.App.1974), this Court in *Livingston* held that there was no violation of the Fifth and Sixth Amendments when a psychiatrist appointed to determine the defendant's competency to stand trial was permitted to testify at the penalty stage of a capital murder trial as to the question of the defendant's future dangerousness. To the same effect are *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976); *Gholson v. State*, 542 S.W.2d 395 (Tex.Cr.App.1976), cert. den., 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed. 2d 1084 (1977); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976); *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr.App.1977); cert. den., 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977); *Von Byrd v. State*, 569 S.W.2d 883, 897 (Tex.Cr.App.1978).

These cases were all in place when appellant's case was tried in September 1978. And after the date of appellant's trial this Court in *Muniz v. State*, 573 S.W.2d 792 (Tex.Cr.App.1978), refused to follow the federal district court ruling in *Smith v. Estelle*, 445 F.Supp. 647 (N.D.Tex. 1977), holding to the contrary as a matter of federal constitutional law. See also *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979).

The United States Supreme Court is the ultimate expositor of the United States Constitution, and we are constrained to follow its interpretation of the Constitution.

**6.** *Battie* held that *Smith* established no new principles of federal constitutional law but merely applied the already fixed principles of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to a new factual situation. *Battie*, at p. 1180. *Battie*, dealt with the retroactivity of the Fifth Amendment violation holding in *Smith*.

720 F.2d 415 (5th Cir.1983); *Muniz v. Procunier*, 760 F.2d 588 (5th Cir.1985), *cert. den., McCotter v. Muniz*, 474 U.S. 934, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985); *Jones v. McCotter*, 767 F.2d 101 (5th Cir.1985), and this Court has applied the decision retroactively as to both Fifth and Sixth Amendment violations. See, e.g., *Thompson v. State*, 621 S.W.2d 624 (Tex.Cr.App. 1981); *Fields v. State*, 627 S.W.2d 714 (Tex.Cr.App.1982); *Ex parte Demouchette*, 633 S.W.2d 879 (Tex.Cr.App.1982); *Ex parte English*, 642 S.W.2d 483 (Tex.Cr. App.1982); *Ex parte Chambers*, 688 S.W. 2d 483 (Tex.Cr.App.1984); *Ex parte White*, 725 S.W.2d 262 (Tex.Cr.App.1987). And as some of the above cases indicate, this has been true even when the collateral attack is by post-conviction writ of habeas corpus.

Still further, it has been said, "[W]here a defect of constitutional magnitude has not been established at the time of the trial, the failure of counsel to object does not constitute waiver." *Ex parte Chambers*, 688 S.W.2d, supra, at 486 (Campbell, J., concurring); *Cuevas v. State*, 641 S.W.2d 558, 563 (Tex.Cr.App.1982); *Ex parte Sanders*, 588 S.W.2d 383 (Tex.Cr.App.1979), and cases there cited. See also *Ex parte Bravo*, 702 S.W.2d 189 (Tex.Cr.App.1986). This is now a part of our state procedural default rule dealing with preservation of constitutional error.

If any thought is entertained of reconsidering the question of the retroactivity of *Estelle v. Smith*, supra, on the basis that *Smith* in fact was a "clear break" with past precedent and practice, that thought has been effectively foreclosed by the recent decision of the United States Supreme Court in *Griffin v. Kentucky*, —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649, 40 Cr.R. 3169 (1987). There it was held that a new constitutional rule for the conduct of criminal prosecutions applies retroactively to all cases, state or federal, pending or direct review or not yet final at the time of the new decision, even if the rule represents a "clear break" with past precedent or practice.

In *Smith v. Estelle*, supra, 101 S.Ct. at 1877, 1878, the Supreme Court stated:

"Our holding based on the Fifth and Sixth Amendments will not prevent the State in capital cases from proving the defendant's future dangerousness as required by statute. A defendant may request or consent to a psychiatric examination concerning future dangerousness in the hope of escaping the death penalty. In addition, a different situation arises where a defendant intends to introduce psychiatric evidence at the penalty stage." [7]

In the instant case the appellant and his counsel had not consented to nor requested an examination on the issue of future dangerousness, had no notice that any examination would be used for that purpose, and did not offer any psychiatric or psychological testimony at the penalty stage of the trial nor indicated that they would do so.

Thus the opinion testimony of Drs. Coons and Parker offered by the State at the penalty stage of the trial was not made admissible because of any consent on the part of appellant to any examination for future dangerousness or because of the use by the appellant of psychiatric or psychological testimony at the penalty stage of the trial. *Smith* is not inapplicable for those purposes.

Further, the testimony of Drs. Coons and Parker cannot be classified as hypothetical opinion testimony of a psychiatrist or psychologist, who has not examined the defendant and who is asked to assume certain hypothetical facts and to give his opinion based on his knowledge of research conducted within his field of expertise. Hypothetical testimony would have been admissible. *Vanderbilt v. State*, 629 S.W.2d 709

---

**7.** The Court then went on to point out that under the Texas capital murder scheme the jury's resolution of the future dangerousness issue is not confined to the province of psychiatric experts, and while not disapproving the use of psychiatric testimony the Court observed that the inquiry mandated by Texas law as to future dangerousness does not require resort to medical experts." Id., 101 S.Ct. at 1878. See also *Crawford v. State*, 617 S.W.2d 925 (Tex.Cr.App. 1980), *cert. den.* 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 431 (1981); *reh. den.* 453 U.S. 925, 101 S.Ct. 3160, 69 L.Ed.2d 1005 (1981); *Williams v. State*, 668 S.W.2d 692 (Tex.Cr.App.1983).

(Tex.Cr.App.1981); *cert. den.* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982); *Smith v. State,* 683 S.W.2d 393 (Tex.Cr. App.1984); *Holloway v. State,* 691 S.W.2d 608 (Tex.Cr.App.1984). See also *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), *reh. den.* 464 U.S. 874, 104 S.Ct. 209, 78 L.Ed.2d 185. Cf., however, *White v. Estelle,* 720 F.2d 415, 417 (5th Cir.1983).

Since Drs. Coons' and Parker's testimony on future dangerousness was expressly based on their examinations of the appellant, their testimony is not that of hypothetical witnesses. *Smith v. Estelle,* supra, is not inapplicable for that reason.

### Waiver

May it be said that *Smith v. Estelle,* supra, is not applicable, at least in part, because of appellant Powell's mere submission to the psychiatric and psychological examinations for the purposes of determining competency and insanity at the time of the commission of the alleged offense?

*Battie v. Estelle,* 655 F.2d 692, 702 (5th Cir.1981), held that submitting to a psychiatric or psychological examination does not *itself* constitute a waiver of the Fifth Amendment's protection. Nor does the fact that the defense may have requested an examination foreclose a claim under *Estelle v. Smith,* supra. *Booker v. Wainwright,* 703 F.2d 1251, 1256 (11th Cir.1983); *Cape v. Francis,* 741 F.2d 1287, 1295 (footnote # 9) (11th Cir.1984). However, *Battie,* citing *United States v. Cohen,* 530 F.2d 43 (5th Cir.) *cert. den.* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976), approved the holding in *Cohen* and stated that *"the introduction by the defense of psychiatric testimony constituted a waiver of the defendant's fifth amendment privilege in the same manner as would the defendant's election to testify at trial." Battie,* 655 F.2d at 702. (Emphasis supplied.)

Here appellant raised the defense of insanity (at the time of the commission of the offense) and called his own psychiatrist to testify on his behalf at the guilt stage of the trial on the defensive issue upon which he had the burden of proof. Thus, under *Battie,* there was a waiver of appellant's Fifth Amendment privilege as to psychiatric testimony, at least at the guilt stage of the bifurcated trial. Under *Battie* does such waiver, without more, survive in the separate penalty stage of a capital murder trial? In *Booker* that very question was not decided because the defendant took the stand and testified at the "advisory sentencing proceedings," and was cross-examined by the prosecutor apparently using information given to the psychiatrist without the constitutional safeguards of *Estelle v. Smith,* supra. The *Booker* Court stated:

"Yet even assuming Booker's statements [to psychiatrist] would not have been admissible in the state's case, there is no constitutional prohibition against using the information for impeachment purposes. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)."

In the instant case the appellant did not testify and did not offer psychiatric testimony at the penalty stage of the trial, so the survival of the waiver question must be answered.

In *Brumfield v. State,* 445 S.W.2d 732 (Tex.Cr.App.1969), this Court, interpreting our bifurcated trial system under Article 37.07, V.A.C.C.P., held that a defendant who waives his privilege against self-incrimination by testifying at the guilt stage of the trial may not be recalled at the penalty stage of the trial to assist the State in proving an issue upon which it has the burden of proof. Thus, the waiver at the guilt stage did not survive until the penalty stage. *Brumfield* has been adhered to since 1969. See, e.g., *Brown v. State,* 576 S.W.2d 36, 38 (Tex.Cr.App.1978) (footnote # 2); *Stewart v. State,* 666 S.W.2d 548, 549 (Tex.App.-Dallas 1984), PDR ref'd (1984).

I would conclude in the instant case that appellant's waiver of the privilege against self-incrimination at the guilt stage by offering psychiatric testimony on the defensive issue of insanity upon which he had the burden of proof did not survive and carry over to the penalty stage of a capital murder trial under Article 37.071, V.A.C.C.P., so that on the basis of such waiver the prosecution could call psychiatric and

psychological witnesses on the issue of future dangerousness on which it had the burden of proof beyond a reasonable doubt where the appellant did not testify nor offer psychiatric testimony or otherwise waive his privilege against self-incrimination at that stage of the trial.

### Harmless Error

As earlier noted, it was not shown Drs. Coons and Parker were instructed, ordered or requested to determine future dangerousness during their examinations of appellant. And it was not shown that the doctors made such pretrial determination on their own, but when called at the penalty stage they gave their opinion testimony on future dangerousness based on their examinations for other purposes.

In *Cape v. Francis*, 741 F.2d 1287, 1297 (11th Cir.1984), the Court noted that both *Estelle v. Smith, supra* and *Spivey v. Zant*, 661 F.2d 464 (5th Cir.1981), *cert. den.* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982) "illustrate the heightened level of scrutiny that must be given claims of sixth and fourteenth amendment violations arising from the introduction of psychiatric testimony. The *cases cannot be read*, however, *as establishing an absolute rule which mandates reversal in any instance where psychiatric testimony exceeds the scope anticipated by defense counsel at the time of the examination.*" (Emphasis supplied.)

The Court then wrote:

"The essence of our focus must be whether the psychiatric examination proved to be "a critical stage" of the aggregate proceedings against the petitioner. Both *Smith* and *Spivey* make clear that such a determination turns upon the actual *use* of the testimony at trial. Such attention ultimately resolves the question 'whether potential substantial prejudice to defendant's rights inheres in the ... confrontation and the ability of counsel to help avoid that prejudice.' *Coleman v. Alabama*, 399 U.S. 1, 9, 90 S.Ct. 1999, 2003, 26 L.Ed.2d 387, 396 (1970), quoting *Wade*, 388 U.S. at 277, 87 S.Ct. at 1932, 18 L.Ed.2d at 1157.

"In *Smith*, the testimony was critical to the State's burden of proving future dangerousness; in *Spivey*, the testimony was utilized to rebut the defendant's obviously decisive insanity defense. In each instance, then, there existed substantial prejudice. In the present case, however, no such prejudice—either actual or potential—is similarly manifest."

In *Cape* the doctor's comment on Cape's sanity at the time of the murder did not address any issue essential to the jury's consideration, and by proving Cape's sanity the State proved a fact not necessary to its burden of proof. The Court held that in the absence of potential prejudice Cape was not deprived of any right at the "critical stage" of the proceedings against him and there was no violation of the Sixth and Fourteenth Amendments.

The facts in the instant case are readily distinguishable from those in *Cape*. The opinion testimony of Drs. Coons and Parker was critical to the State's burden of proving special issue number two (2) at the penalty stage of the trial—that of future dangerousness. It was the only opinion testimony offered at that stage on one of the very issues before the jury. Given the actual *use* of the testimony, the psychiatric and psychological examinations were shown to be "a critical stage" of the aggregate proceedings against the appellant with regard to his Sixth Amendment right to counsel. In my opinion harmless error discussion is of little aid to the State in the instant case.

In *Satterwhite v. State*, 726 S.W.2d 81 (Tex.Cr.App.1986), this Court found no Fifth Amendment violation in a capital murder case where the death penalty had been imposed, but concluded there was a Sixth Amendment violation under *Estelle v. Smith,* supra. Nevertheless, the Court found that the constitutional error was harmless error beyond a reasonable doubt given the circumstances of the particular case. There was no question that Dr. Grigson's testimony on future dangerousness at the penalty stage of *Satterwhite* was tainted by Sixth Amendment error. However, the same testimony, not shown to be

tainted, was elicited from a psychologist, and there was evidence of four prior felony convictions, other unadjudicated extraneous offenses or incidents involving a shooting and attempted use of a loaded pistol against a police officer, testimony from eight (8) peace officers that the defendant's reputation for being a peaceful and law-abiding citizen was "bad," as well as the testimony from the guilt stage of the trial which was before the jury. See *Bravo v. State*, 627 S.W.2d 152 (Tex.Cr.App.1983); *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr. App.1979). In *Satterwhite*, this Court wrote:

> "We conclude that the properly admitted evidence was such that the minds of an average jury would have found the State's case sufficient on the issue of the 'probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society' even if Dr. Grigson's testimony had not been admitted. The admission of the testimony was harmless error beyond a reasonable doubt. *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980)."

In the instant case the opinion testimony of Drs. Coons and Parker was the only opinion testimony on the future dangerousness, and it was tainted by Sixth Amendment error. Unlike *Satterwhite*, there was no untainted opinion evidence on the same issue.

It is true, of course, that in answering the special issues under Article 37.071, V.A.C.C.P., including the issue of future dangerousness, the jury may consider all of the admitted evidence at the first or guilt stage of the bifurcated trial. *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr.App.1981), and cases there cited; *Russell v. State*, 598 S.W.2d 238, 254 (Tex.Cr.App.1980); *Russell v. State*, 665 S.W.2d 771, 781 (Tex.Cr.App. 1983). And this, of course, would include the testimony of appellant's own psychiatrist on the issue of insanity as a defense. It has been said that the circumstances of the offense and the facts surrounding it may furnish greater probative evidence than any other evidence regarding the second special issue (future dangerousness) submitted at the penalty stage of a capital murder trial. *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978). See also *Carter v. State*, 717 S.W.2d 60 (Tex.Cr.App.1986); *Fierro v. State*, 706 S.W.2d 310, 319 (Tex. Cr.App.1986); *Bush v. State*, 697 S.W.2d 397, 399 (Tex.Cr.App.1985).

The test for harmless federal constitutional error is not whether a conviction could have been had without the improperly admitted evidence but "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 827, 17 L.Ed.2d 705 (1967). See also *Jordan v. State*, 576 S.W. 2d 825 (Tex.Cr.App.1978); *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980); *Clemons v. State*, 605 S.W.2d 567 (Tex.Cr. App.1980). In *Saylor v. State*, 660 S.W.2d 822 (Tex.Cr.App.1983), this Court wrote:

> "To apply this test [set out in *Chapman*], this Court has found it necessary to consider not only the evidence adduced at the guilt-innocence stage, but also the punishment stage. *Garrett v. State*, 632 S.W.2d 350 (Tex.Cr.App.1982); *Clemons v. State*, 605 S.W.2d 567, 571 (Tex.Cr. App.1980); *Jordan v. State*, 576 S.W.2d 825 (Tex.Cr.App.1978)."

The question cannot be answered by merely considering the error in isolation. *Harryman v. Estelle*, 616 F.2d 870, 876 (5th Cir.) (en banc), *cert. den.* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). The facts and circumstances of each individual case must be considered. *Bird v. State*, 692 S.W.2d 65 (Tex.Cr.App.1985).

It must be kept in mind that the test applies not only to the conviction but to the punishment assessed as well. Thus if there is a reasonable possibility that the error tainted evidence might have contributed to either the conviction or the punishment assessed, then error in the admission of evidence is not harmless federal constitutional error. *Plante v. State*, 692 S.W.2d 487 (Tex.Cr.App.1985); *Maynard v. State*, 685 S.W.2d 60, 67 (Tex.Cr.App.1985); *Johnson v. State*, 660 S.W.2d 536 (Tex.Cr.App. 1983). See also *Ford v. State*, 676 S.W.2d 609 (Tex.App.-Beaumont 1984); *Jordan v. State*, supra.

Since the complained of testimony occurred at the penalty stage of the capital murder trial, the question to be resolved relates to "the punishment assessed" or more appropriately to the jury's affirmative answers to the special issues which resulted, as a matter of law, in the imposition of the death sentence by the court.

The facts of the instant case show a brutal, unnecessary, senseless murder of a police officer while in the performance of his official duties. The officer was shot and killed by appellant with an AK–47 automatic rifle. Appellant shortly thereafter shot at another officer apparently with the same weapon and also threw a hand grenade which luckily did not explode. There was other evidence as to appellant's use and possible sale of drugs, his lifestyle and mental health instability, etc. There was no evidence of prior convictions, but there was evidence of prior unadjudicated offenses. To this evidence was added the tainted testimony of the State's doctors on future dangerousness.

Under this record the death penalty assessed by virtue of the jury's affirmative answers to the special issues submitted at the penalty stage of the trial could not be considered unusual, but that is not the question presented. The question is whether or not we can say that the improperly admitted evidence was harmless error beyond a reasonable doubt and did not contribute to the affirmative answer to the special issue "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.-071(b)(2), V.A.C.C.P. In determining this question the main consideration is the probable impact on the minds of the average juror. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Gauldin v. State*, 683 S.W.2d 411, 415 (Tex.Cr.App.1984). The issue of future dangerousness was one of the critical issues before the jury at the penalty stage, and the tainted evidence was the only medical and opinion testimony offered on that issue upon which the State had the burden of proof. I must conclude, though reluctantly, that there was a reasonable possibil-ity that the testimony contributed to the jury's verdict. I cannot say that the evidence admitted on violation of appellant Powell's federal constitutional rights constituted harmless error beyond a reasonable doubt. See *White v. Estelle*, supra; *Holloway v. Arkansas*, 435 U.S. 475, 489–490, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978).

For the reasons stated, I dissent.

CLINTON, J., joins this opinion.

TEAGUE, Judge, dissenting and concurring.

I join the dissenting opinion that Presiding Judge Onion has filed in this cause because he has stated therein what I believe is the law today in this State on the *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), issue that is before this Court to be resolved. Notwithstanding my agreement with Presiding Judge Onion's dissenting opinion, but because I believe that what Judge McCormick has stated and held in the majority opinion that he writes for the Court will soon be, in principle at least, the law of the federal constitutional land, on the *Estelle v. Smith*, supra, issue, I am constrained to agree with what he has stated and held. Therefore, I dissent and concur.

A majority of this Court, at least since I have been a member of this Court, though often given the opportunity to decide a given issue on independent state grounds, and not on Federal Constitutional grounds, has always chosen to be lured by the siren that is sounded on the banks of the Potomac, and thereafter, in lock-step fashion, has always uniformaly marched to whatever tune the drummer that is located in the Supreme Court Building, Washington, D.C., plays.

Given the above fact of life, I would further delay handing down the majority opinion in this cause until the Supreme Court of the United States finally decides *Satterwhite v. Texas*, —— U.S. ——, 107 S.Ct. 2480, 96 L.Ed.2d 372 (1987).

The Supreme Court of the United States, notwithstanding the fact that a majority of this Court, in affirming the judgment of conviction in *Satterwhite v. State*, 726 S.W. 2d 81 (Tex.Cr.App.1986), only gave the defendant little more than the time of the day in its opinion on the *Estelle v. Smith*, supra, issue, has granted certiorari to review what this Court stated and held in *Satterwhite v. State*, supra, concerning *Estelle v. Smith*, supra.

I cannot, of course, predict exactly what the Supreme Court will state and hold in *Satterwhite v. Texas*, supra. However, given what that Court's aggressive and assertive majority has done in the field of criminal law to defendants since the "Burger Court" came into existence, and its make-up since that day has not changed, and even though I am no Jimmy the Greek, I believe that I can predict what it will generally do on that issue. It will, in principle at least, state little more than what Judge McCormick has already stated and held, although it could in the extreme expressly overrule its decision of *Estelle v. Smith*, supra, because that opinion was sensitive to the rights of the accused and insensitive to state abuses, and the present aggressive and assertive majority of the Supreme Court does not appear to like to hand down decisions that are insensitive to government or state abuses in the field of criminal law.

Thus, because the majority of this Court votes to hand down today the majority opinion by Judge McCormick, and because I firmly believe that what Judge McCormick has stated and held in principle is what the Supreme Court of the United States will ultimately state and hold on the *Estelle v. Smith*, supra, issue, in *Satterwhite v. Texas*, supra, and because a majority of this Court has long opted to follow what the Supreme Court stated and held in *Estelle v. Smith*, supra, I am constrained to agree with what he has stated and held.